FOURNET, Justice.
 

 This original proceeding was instituted by the State Bar of Louisiana upon the recommendation of its Board of Governors on August 8, 1939, seeking to have Dudley L. Weber suspended from practicing law in this state on the ground that he had “knowingly attempted to secure a divorce for non-residents of Louisiana in the State of Louisiana, contrary to law *
 
 *
 
 * and knowingly used the testimony of suborned and perjured witnesses to this end.” His actions in this respect were alleged to have grown out of the case of Rita Dingco v. Lorenzo Dingeo.
 

 Appearing in his own behalf, the defendant first filed an answer generally
 
 *1040
 
 denying all of the allegations of the petition. Subsequently, through counsel, and reserving all of his rights under his original answer, the defendant entered a special plea expressing his willingness to accept the reprimand which, in authorizing the institution of these proceedings, had been recommended by the Board of Governors, in order that the further embarrassment, expense, and delay attendant upon any additional hearing might be avoided. This 'special plea was referred to the Hon. Ben B. Taylor, the Commissioner appointed by this court upon the recommendation of the Board of Governors to take the evidence in the case, for such action as he might deem appropriate.
 

 In the meanwhile, however, the Legislature of Louisiana, by its adoption of Act No. 55 of 1940, repealed Act No. 10 of the Second Extra Legislative Session of 1934, which act had created the State Bar of Louisiana, and, in its Act No. 54 of 1940, memorialized this court to create the Louisiana State Bar Association. On January 13, 1941, the Committee on Professional Ethics and Grievances appointed by this court to handle disbarment and suspension proceedings under the new state bar organization, filed a supplemental and amended petition under which the disbarment of the defendant is sought. The defendant, filing a supplemental and amended answer to this petition, reiterated all of the allegations contained in his original answer, that is, he denied he had been guilty of any misconduct. After numerous continuances the case was finally heard on November 28, 1941, before Hon. Hermann Moyse, the member of the East Baton Rouge Parish bar appointed the Commissioner for such purpose on May
 
 27,
 
 1941, after Mr. Taylor, the commissioner formerly named by us, was relieved of his duties upon his own request. The only testimony taken at this hearing, and that by depositiofi, was the testimony of Solomon M. Reich, an attorney of the New York State Bar, upon whose complaint the original investigation of Mr. Weber was instituted. In addition to this testimony, however, there was also introduced in evidence and made a part of the record a photostatic copy of the record in the Dingeo v. Dingeo case; the affidavit of Harris M. English, the curator-ad-hoc in the Dingeo case; letters from Judges Holcombe and Womack of the Nineteenth Judicial District; photostatic copies of letters, telegrams, and affidavits from the files of Solomon M. Reich; and the testimony taken at three hearings, viz.: (1) The hearing before the two judges of the Nineteenth Judicial District Court on September 30, 1938, at which the defendant was not present; (2) before the Ethics Committee of the Baton Rouge Bar Association on October 10, 12, and 19 of 1938, which the defendant attended without any previous notice having been given him; and (3) before the Disbarment Committee of the Sixth Congressional District and the East Baton Rouge Bar Association on January 12 and 26 of 1939.
 

 The Commissioner concluded the allegation of the petition that the defendant “knowingly attempted to secure a divorce for non-residents of Louisiana in the State of Louisiana * * * and knowingly used the testimony of suborned and perjured witnesses to this end” was amply supported
 
 *1042
 
 by the evidence, and he recommended the defendant’s suspension from the practice of law in this state for a period of two years.
 

 The defendant first excepted to the Commissioner’s report on the ground that the Committee on' Professional Ethics and Grievances of the new state bar organization “was wholly without power and without jurisdiction ratione materiae to change the charge from suspension to disbarment or to make any change in the proceeding whatever, other than as is disclosed by the report and recommendation” of the Board of Governors of its predecessor; consequently, the conclusions and recommendations ' of the Commissioner which were predicated upon the supplemental and amended petition filed by the Committee, and the evidence introduced thereunder, should be vacated and set aside.
 

 This exception is without merit. The fact that this court appointed a new Committee on Professional Ethics and Grievances to replace the committee ..that had been in existence when these proceedings were instituted did not deprive the new committee of the right to prosecute the case to a final determination. In re Mundy, 182 La. 148, 161 So. 184. Moreover, the committee had a right, if in its opinion the charges brought against the defendant and the evidence supporting the same warranted such action, to ask that Weber be disbarred instead of suspended. The issues were not changed by such action, as contended by the defendant. As a matter of fact, the new committee reiterated “all of the allegations contained in the original petition.”
 

 These proceedings were precipitated by a letter addressed to Albritton & Hardin, attorneys at law in the City of Baton Rouge, on September 15, 1938, by Solomon M. Reich, an attorney at the New York Bar, at whose request Weber had instituted a divorce case in the Nineteenth Judicial District Court entitled Dingeo v. Dingeo. In this letter, Reich complained about Weber’s failure to secure the final divorce decree as promised and he asked if Albritton & Hardin were in a position to prosecute the case to final judgment and to also institute suit to recover the moneys paid Weber,., as well as other expenses incurred, such as long distance calls and telegrams. In the letter is found the following statement: “Some time ago, an attorney by the name of Dudley L. Weber, having his offices at 205 Reymond Building, Baton Rouge, La., represented to our office that he is able to handle divorce cases under certain conditions, amongst which he enumerated the fact that where the parties were separated for four years and there was a desertion for a period of over four years, that he was in a position to institute an action for divorce and obtain the decree, although the parties were not present in Louisiana at the time. Accordingly, Mr. Weber handled several cases for this office and it seemed satisfactory, because in each and every case we obtained a decree from the Court granting the divorce in such action.”
 

 To the letter Reich attached a copy of a letter he purportedly wrote Weber on December 2, 1937, which reads as follows:
 

 “I am enclosing herewith a check for $50.00 as your fee to handle a new case
 
 *1044
 
 entitled Rita Dingeo v. Lorenzo Dingeo, her husband, in which she is asking for an absolute divorce on the grounds of desertion and abandonment.
 

 “The parties were married on April 20th, 1931 in the Municipal Building in New York County, New York. There is a male issue of this marriage, to wit, a boy named Theodore, who was born on April 30th, 1932 and who is now more than five years of age. The youngster at the present time is in the custody of the plaintiff, his mother. Her address is 462 Neptune Avenue, Brooklyn, New York and the address of the defendant is 353 West 85th Street, Manhattan, New York City, apartment 322 a.
 

 “The defendant deserted the plaintiff in June, 1932 and there has been a continual separation between the spouses for a period upwards of four years.
 

 “In this action, will you kindly appear for the plaintiff and obtain the necessary decree and also have her maiden name restored to her, her maiden name being Segal and that her child may take on the name of Segal.
 

 “Will you kindly expedite this matter and advise me as to the proceedings.”
 

 By a letter of September 19, 1938, addressed to Reich by two Baton Rouge law firms, Albritton & Ware and Durrett &'Hardin, he was advised the judgment in the Dingeo case had not been signed and he was requested to furnish certain information with respect to the residence, domicile, and separation of the two parties to ■ the suit. In this letter Reich was also asked whether or not he had had any correspondence with Weber concerning the Dingeo case other than the copy of the letter of December 2, 1937, which he had attached to his letter of September 15. Replying to this letter on September 22, Reich advised the Baton Rouge attorneys that neither party to the divorce had ever lived in Louisiana, having resided continuously in the State of New York, where they were separated and where both then lived. He stated he was enclosing copies “of all correspondence had between Mr. Weber and myself, outside of telegrams and telephone calls.” He also pointed out that “only once has he (Weber) questioned the marital relationship of the parties and that was on July 1st, 1938, fully seven months after the case was forwarded to him.” (Brackets ours.)
 

 On October 3 these attorneys advised Reich Louisiana had no jurisdiction to entertain the divorce proceedings under such circumstances; that the petition filed by Weber in the Dingeo 'case not only contained false allegations, but it appeared false testimony had been introduced by him when the case was partially tried, all of which was being referred to the proper authorities for disciplinary action. He was requested to furnish immediately the originals of all letters written him by Weber in connection with the Dingeo divorce proceeding, and all copies of his letters to Weber, including telegrams, as well as a complete copy of each of his files in the several divorce cases he alleged Weber had handled for him.
 

 In the meanwhile, on September 30, thft two judges of the Nineteenth Judicial
 
 *1046
 
 District Court, Charles A. Holcombe and James D. Womack, summoned and questioned the witnesses who testified when the Dingeo case was partially tried by Weber, but Weber was not present on this occasion. On October 10, 12, and 19, an investigation of the same matter was conducted by the Ethics Committee of the Baton Rouge Bar Association, to which investigation Weber was summoned to appear summarily. After some interrogation without the benefit of his files, he was allowed to return to his office and secure them. He turned this file over to the committee and testified in connection therewith.
 

 Weber stated the petition in the Dingeo case was prepared from information which he jotted down on a blank envelope as it was given him by Reich over long distance telephone. This envelope was in the file and was introduced in evidence. He denied having handled any other divorce- case for Reich or having advised him, as stated in Reich’s letters of September 15 and 22 to the Baton Rouge attorneys. He challenged Reich to produce such correspondence. He also denied having paid the witnesses who testified in the Dingeo case or having knowingly tendered perjured testimony in the case, giving a detailed statement of how the witnesses were procured.
 

 It appears that up to this time Reich had not complied with the request of Albritton & Ware and Durrett & Hardin to produce his files in connection with the Dingeo case or to furnish the information requested with respect to other divorce cases instituted by Weber for him. As a result, Hon. D.-M. Ellison, President of the State Bar of Louisiana, sent him several wires, the last on January 24, 1939, advising that these documents were necessary ■ to the further prosecution of the investigation which had been instituted. The next day (January 25, 1939) Reich requested that Ellison forward $25 or $30, the cost of having . the documents photostated. The same day Ellison sent him $25 for the specific purpose “of securing- certain photostatic copies of documents in your possession concerning Dudley L. Weber.” The receipt of these documents was acknowledged by Ellison in an air mail letter of January 31, and Reich was requested to send him an affidavit describing each document and also an itemized receipt “showing the costs that were incurred in the expenditure of the $25.00”. Neither the affidavits nor the itemized receipt was ever sent by Reich.
 

 The Board of Governors of the State Bar of Louisiana, at a meeting held on April 27, 1939, thereafter, adopted the following resolution: “In the Dudley L. Weber case, it is the opinion of the Board that the record shows proper cause for submission to the Supreme Court for suspension, but it is the recommendation of this Board that the Supreme Court, in its discretion, show the defendant leniency and in the event the record shows only a reprimand is necessary, it is the sense of the Board that that will be sufficient punishment, if the facts, as brought out in the record, justify it.”
 

 The present committee, having before it the same evidence reviewed by the Board of Governors of the State Bar of Louisiana when the above recommendation was made,
 
 *1048
 
 sought to have the defendant disbarred, while the Commissioner recommended that he be suspended for a period of two years.
 

 “In disbarment proceedings * * * the evidence not only as to the act which forms the basis of the attorney’s unprofessional conduct but also as to the motive with which the act was done, must be clear and convincing.” In re Novo, 200 La. 833, 846, 9 So.2d 201, 205, and the authorities therein cited.
 

 We do not think the evidence in the record Is clear and convincing that when Weber filed the Dingeo suit he knew these parties were not married in this state and had never resided here. While Reich did testify to that effect, we are not impressed by his testimony. In his purported letter of December 2, 1937, Reich stated he was sending Weber “$50.00 as your fee to handle
 
 a new case.”
 
 (Italics ours.) In his letter to Albritton & Hardin on September 15, 1938, Reich stated: “* * * Mr. Weber handled several cases (along the same lines) for this office and it seemed satisfactory, because in each and every case we obtained a decree from the Court granting the divorce in such action.” (Bracket ours.) Not only did he fail to furnish copies of his files in the other cases purportedly handled for him by Weber when requested to do so by both Ellison and the Baton Rouge attorneys, but the search made of the official court records by the.two judges of the Nineteenth Judicial District Court at Baton Rouge failed to disclose that any such decrees" had been obtained by Weber. In addition to this, when Reich was requested on c.ross-interrogatories to name any case other than the Dingeo case handled for him by Weber, he replied: “My best recollection is that Mir. Weber handled at least one other case for me, in which a final decree and judgment of divorce was obtained.” Further, Reich was never able to substantiate in any manner his statement in his letter of September 15, 1938, that he had correspondence showing Weber advised him divorce decrees for non-residents could be obtained in this state when there was an appearance for both parties.
 

 On the other hand we have Weber’s vehement denial that he ever received Reich’s purported letter of December 2, 1937. He stated, to the contrary, that he had prepared his petition in the Dingeo case from some notes jotted down on an envelope as the information was given him over long distance by Reich. The envelope, with these notes, is in evidence and corroborates his version of the matter, for the address of Lorenzo Dingeo as given by Weber in the petition is 353 West 8oth Street, Manhattan, identical with the notation on the envelope, and not 353 West 85th Street, as given in Reich’s purported letter of December 2, 1937.
 

 Our doubt of Reich’s sincerity is further emphasized by the fact that he utterly ignored Ellison’s request a week after it was sent to account for the $25. When questioned about his failure to make this accounting when he was giving his deposition, he stated that while the photostatic copies had been obtained by some one in his employ, he had no record of the expenditures, and neither he nor any one
 
 *1050
 
 in his office could remember from whom they had been obtained or how much they cost. Too, he never complied with Ellison’s request that he furnish affidavits describing each of the documents transmitted.
 

 It is difficult to ascertain from the record as it is made up exactly when the defendant became apprized of the fact that the Dingeos never resided in Louisiana and that, consequently, the witnesses tendered by him, testifying to that effect, were perjurers. The petition in the Dingeo case was filed-on January 10, 1938. The numerous telegrams, letters, and telephone calls from Reich indicate he was insistent about obtaining the divorce decree and was impatient about the delays. The case was finally tried on June 10. 1938, at which time Weber sought to prove up his case by the testimony of Dranguet and Cangelosi, both of Baton Rouge, Louisiana, but the trial judge refused to grant the divorce for the reason that there was no proof to show the parties had been married in Louisiana. Whereupon Weber offered the witness Louie Guidry, who testified the Dingeos were married in Plaquemine Parish. But again the judge refused to grant the divorce when Guidry, questioned by the court, stated he was drinking at the time and did not know whether a preacher or justice of the peace had married them.
 

 The record does show that Reich, having become impatient because he had not obtained the divorce, wrote the letter of September 15, 1938, above referred to, which precipitated the investigation by the district judges, during which investigation Dranguet and Cangelosi declared their testimony in the Dingeo case was not only false but that Weber had paid them to so testify. Since that time Judge Holcombe has stated in writing that he “had little faith in the veracity of the witnesses” while Judge Womack not only agreed with him but added that “The character of these witnesses is such, and the quality of their testimony, that there was little occasion to attach any weight to what they said.” The Commissioner concurred with the district judges in this respect but concluded it made no difference in the ultimate outcome of the case, since he was convinced Weber knew at the time the witnesses were testifying falsely. Furthermore, he was of the opinion that Weber had not satisfactorily explained his failure to ascertain from the vital statistics records of East Baton Rouge Parish, or otherwise, whether or not the Dingeos had ever been married there and to correct his petition accordingly.
 

 A mere reading of the testimony of Dranguet and Cangelosi convinces us that the Commissioner and the judges were correct in giving no credence thereto. Further, we agree with the Commissioner that Weber’s explanation of his conduct after he became aware of the fact that the Dingeos were never residents of this state and had not been married here is unsatisfactory, particularly his failure to contact Mrs. Dingeo, whom he represented, or to secure information as to her whereabouts from Reich, It seems to us it would have been a very simple matter for Weber to have advised Reich, who was demanding that Weber either produce results or return the money sent him, that if
 
 *1052
 
 he desired a divorce decree in the Dingeo case, he had hut to furnish the necessary information. It is our conclusion that Weber’s action in these respects constitutes professional misconduct, and it becomes our duty to determine whether-we wish to adopt the recommendation of the Commissioner that he be suspended for a period of two years, to which recommendation no exception was filed by the committee.
 

 As was pointed out in Thornton’s work on Attorneys at Law, quoted with approval by this court in the case of In re Novo, 200 La. 833, 9 So.2d 201, 213, “The solution of this question frequently involves too many considerations of public policy and concrete justice, dependent upon the gravity and consequences of the misconduct, the age, character, and reputation of the attorney, the probability of his reformation, the circumstances attending the commission of the offense, and the like, that no fixed or arbitrary rules have been, or properly can be, adopted by the courts. * * * It is a generally accepted principle, however, that since the primary purpose of a disbarment proceeding is not punishment, but the protection of the courts and the public, disbarment should never be decreed, if any discipline less severe would accomplish the desired result, as when there are prospects that the attorney’s, conduct and character may undergo reformation.” Vol 2, Section 894. See, also, Lenihan v. Commonwealth, 165 Ky. 93, 176 S.W. 948, L.R.A. 1917B, 1132; Ex parte Wall, 107 U.S. 265, 2 S.Ct. 569, 614, 27 L.Ed. 552; and Bradley v. Fisher, 13 Wall. 335, 355, 20 L.Ed. 646.
 

 Applying the foregoing maxim to the facts of the case as we find them to be, we think the suspension of two years recommended by the Commissioner is excessive and that a suspension of
 
 two
 
 months would accomplish the end desired. As pointed out by the Commissioner, Mr. Weber is approximately sixty years of age and has been guilty of no misconduct as an attorney during the past twenty-nine years. The probability of any future misconduct on his part is remote. Moreover, it cannot be said he was motivated by personal gain in this instance, since the small fee of $50 sent him by Reich was returned.
 

 For the reasons assigned,, it is ordered, adjudged, and decreed that Dudley L. Wéber be and he is hereby suspended from the practice of law in the State of Louisiana for a period of
 
 two
 
 months, such period to begin with the day this decree becomes final. All costs of these proceedings are to be paid by the defendant.