145 So.2d 774 (1962)
243 La. 618
LOUISIANA STATE BAR ASSOCIATION
v.
Thomas B. WHEELER.
No. 45533.
Supreme Court of Louisiana.
October 3, 1962.
Rehearing Denied November 5, 1962.
*775 John Pat. Little, Chairman, Trial Counsel, New Orleans, Bascom D. Talley, Jr., Vice-Chairman, Bogalusa, Pat W. Browne, Sr., New Orleans, A. K. Goff, Jr., Ruston, Walter G. Arnette, Jennings, for Committee on Professional Ethics and Grievances, Louisiana State Bar Association.
James J. Morrison, Leonard A. Calcagno, New Orleans, for respondent.
FOURNET, Chief Justice.
This court's Committee on Professional Ethics and Grievances, upon the complaint of the firm of Heineke, Conklin, and Schrader of Chicago, Illinois, contained in a letter dated April 20, 1960, instituted this proceeding against Thomas B. Wheeler, an attorney practicing in New Orleans, under the original jurisdiction vested in us by Section 10 of Article VII of the Louisiana Constitution of 1921, seeking his disbarment on charges of professional and ethical misconduct.
The petition, predicated on two specifications drawn by the committee following a full hearing, charges, briefly, that (1) the respondent, despite repeated demands, failed and refused to discharge his professional and legal duty to timely process, settle, account for, report and surrender several hundred files forwarded to him under an agreement between them, and arising out of claims for damages to ocean marine cargo covered by policies underwritten through companies represented by the Illinois firm, referred to as The Atlantic Companies,[1] and (2) violated his obligations and responsibilities in his fiduciary capacity as an attorney by commingling with his own, and converting to his own use, funds received by him for the account of the Illinois firm and its client companies.
After issue was joined by the respondent filing what is, in effect, a general denial, the matter was heard by the Honorable A. J. Waechter, Jr., an attorney of New Orleans, who was the Commissioner appointed by this court to take the evidence and report his findings of fact and conclusions of law in accordance with the procedure set out in the rules adopted by this court pursuant to our constitutional authority in such matters.[2]
*776 In a carefully prepared report, filed with the court on November 27, 1961, wherein he succinctly states and analyzes the charges and defenses in the light of all of the evidence, Mr. Waechter concluded the committee had established "without question" that the respondent was guilty of the charges against him, with the exception of that portion of Specification No. 1 alleging he had exceeded his authority with reference to the settlement of claims. He, nevertheless, recommended that the respondent be suspended from the practice of law in this state for a period of two years from the date of a final decree in this matter.
On December 18, 1961, the respondent objected to this report on sixteen counts, two of which are exceptions of no cause and no right of action, the remainder touching on the merits. On January 9, 1962, the committee excepted to that portion of the report recommending only the suspension of Wheeler. Counsel representing the respondent thereafter countered with a motion seeking to strike the committee's exception and to dismiss the entire proceedings.
This motion and the exceptions of no cause and no right of action rest on counsel's strained and devious effort to restrict this court's jurisdiction in matters affecting disciplinary action against members of the Louisiana State Bar Association through a highly technical interpretation and application of Section 10 of Article VII of the constitution and this court's rules governing such proceedings adopted pursuant to the authority there conferred.
The basis of counsel's contentions and arguments in support of the motion and exceptions stems from the erroneous assumption that (1) inasmuch as the committee's petition only prayed for respondent's disbarment, without seeking his suspension in the alternative, as recommended by the Commissioner, and (2) since the committee failed to timely object to the report, it, as well as this court is, under our rules, bound thereby, and the entire proceeding must be dismissed as moot as there is nothing before this court for review.
Respondent's ingenuous presentation reflects a clear misunderstanding and misinterpretation of our constitutional authority and rules. It hinges in part on the erroneous assumption that this court is powerless to suspend an attorney in such proceedings where the committee has not specifically prayed for the suspension recommended by the commissioner, and in part on a misconception of the effect of the failure of the parties to object to the commissioner's report within the twenty-day period provided in our rules. It also hinges in part upon unwarranted effect sought to be imputed to the recommendation of a commissioner appointed to hear evidence in a disbarment proceeding, and in part upon the total inaccuracy of respondent's frequently reiterated conclusion that a commissioner's recommendation of anything less than disbarment is tantamount to the committee's failure to prove any misconduct warranting disbarment.
Pursuant to the provisions of the Louisiana Constitution of 1921 granting this court "exclusive original jurisdiction in all disbarment cases involving misconduct of members of the bar, with the power to suspend or disbar under such rules as the court may adopt,"[3] we created a Committee on Professional Ethics and Grievances charged with the mandatory duty of (1) investigating all complaints lodged against members of the Bar, and (2) instituting disbarment or suspension proceedings if, after investigation, it finds the conduct complained of warrants such action. Sections 2, 3, and 4 of Article XIII of the *777 Articles of Incorporation of the Louisiana State Bar Association.
After such a proceeding has been instituted and issue joined by the filing of an answer by the accused member within fifteen days, "the court may hear the evidence, or the court may appoint a commissioner to take the evidence in chambers." Section 7. If a commissioner is appointed for this purpose, as was done in the instant case, he is required, upon the termination of the hearing, to "report to the Supreme Court his findings of fact and conclusions of law." Section 9. This section further provides that "The parties shall have twenty days from the filing of the report to file exceptions thereto, and if no exceptions are, within that period, filed by either party, the report shall stand confirmed." And while it is true that a commissioner customarily appends to his report a recommendation that may be informative, or, conceivably, persuasive, such recommendations are not authorized in our rules or orders, and are not, therefore, binding on this court. (The emphasis has been supplied.)
This court, in the case of In re Reed, 207 La. 1011, 22 So.2d 552, aptly observed that no harm had been done by the commissioner's recommendation with respect to the imposition of a penalty since his "report is prepared and furnished solely for the court's assistance and convenience in determining the issues of the disbarment proceeding, and any recommendations contained therein are not conclusive on the court. It can and will, in its discretion, either reject or adopt them." See, also, In re Weber, 202 La. 1037, 13 So.2d 341; Louisiana State Bar Association v. Steiner, 204 La. 1073, 16 So.2d 843; and Louisiana State Bar Association v. Woods, La., 141 So.2d 828. (The emphasis has been supplied.)
It necessarily follows, therefore, that the commissioner's recommendation of suspension in this case can have no effect whatsoever on its final outcome; and inasmuch as suspension is less than, but implicit in, the more severe disciplinary action of disbarment, it is not mandatory that the committee plead one or the other, or both in the alternative. Regardless of the manner of pleading, or the recommendation of the commissioner, it is the ultimate duty of this court to determine under the broad discretion vested in it what action, if any, is to be taken against an attorney charged with misconduct and unethical dealings in the discharge of his professional responsibilities. See, In re Craven, 204 La. 486, 15 So.2d 861; In re Novo, 200 La. 833, 9 So. 2d 201; In re Weber, supra; Louisiana State Bar Association v. Steiner, supra; and In re Reed, supra.
Having reached this conclusion, it is obvious the entire basis upon which counsel's argument is predicated falls, as the commissioner in the instant case concluded the committee had proved by clear and convincing evidence all of the charges against Wheeler with the exception noted. Hence it was not necessary for the committee to except to his report unless it intended to object to the finding with respect to this exception, i.e., that Wheeler had exceeded his authority in the settlement of claims. And whether respondent's exception to the report, filed December 18, 1961, was timely[4] is immaterial under the circumstances, for this court, in discharging its responsibility in disbarment proceedings must, of necessity, review the record in order to mete out the proper disciplinary action *778 in the light of the charges, defenses, evidence, and report of the commissioner. That portion of Section 9 of Article XIII of the Articles of Incorporation of the Louisiana State Bar Association providing the report "shall stand confirmed" where no exceptions are timely filed, means only that it stands confirmed as to the party or parties failing to except "within" the twenty-day period from its filing. Our right to review the record in such an important matter has nevereither by our rules or in our pronouncements in individual casesbeen relinquished or surrendered to the commissioner; and the parties, by failing to timely object to his report, cannot thus curtail the duties and responsibilities of this court. A mere perusal of the cases relied on by the respondent[5] will readily disclose they are not apposite from a legal or factual standpoint, and are, therefore, not controlling.
The Commissioner concluded "The evidence establishes without question that the respondent was guilty of the failure to faithfully and honestly discharge his professional and legal duty to report, account for and remit the monies collected by him for the account of The Atlantic Companies. The evidence further establishes without question that the monies collected by him for the account of his client were commingled with his own funds and used by him for his own purposes. Although during the course of the Commissioner's hearings respondent made restitution of the funds for which he had to that time refused to account or remit,[6]his testimony demonstrated that he not only failed to recognize the gravity of his actions but attempted to exculpate himself by laying the blame on the shoulders of those persons who were damaged by his improper conduct." (The emphasis has been supplied.)
A careful review and study of the record in this case convinces us it clearly supports the Commissioner's conclusion that the committee established the charges against the respondent with the exception noted,[7] and, in so far as pertinent here, his *779 report in support of this conclusion is as follows:
"In July of 1954 respondent agreed with a firm of Chicago attorneys that he would through them represent a group of marine cargo underwriters (The Atlantic Companies) and would undertake to collect on a contingent fee basis claims for damage to ocean marine cargo against the ships and their owners on which the cargo was damaged while being transported. In accordance with this agreement, between July 1954 and the end of 1956 the Chicago firm forwarded to the respondent for handling a large number of cargo claims (approximately eight to nine hundred individual cargo claim files).
"By letter dated January 17, 1957, the Chicago firm sent to the respondent a list covering approximately seventy-five per cent of the cargo claims which had theretofore been forwarded to him, and requested him to review the files and give them a status report. Having failed to receive a satisfactory answer from the respondent, the Chicago attorneys by letter dated March 27, 1957, forwarded a second list to the respondent wherein they set forth file numbers and dates of correspondence authorizing settlements, and requested respondent to forward any funds representing settlements made by him. There followed numerous written and telephone requests for a report on the status of the outstanding claims and for a remittance of collected funds. Finally, being unable to secure any satisfaction, by letter dated December 17, 1958, the Chicago firm wrote the respondent reviewing the history of their relationship, attaching a list of those claims believed to have been compromised but on which remittance had not been made, and directing the respondent to turn over all unfinished matters to a New Orleans law firm for further handling. Respondent did not comply with these instructions until after many months of repeated written and oral demands by both the Chicago and New Orleans attorneys. Finally, in October of 1959, the respondent delivered to the New Orleans attorneys a number of files which were in suit or which had not yet been finally settled or closed.[8]
"Repeated additional demands by the Chicago firm resulted in securing from the respondent by letter dated December 19, 1959, the return of one hundred and eleven files with a list showing the numbers of the files forwarded on which recoveries had been made and the amounts of the recoveries, which totalled $4,991.66.[9] Respondent acknowledged that after deducting his fee, the client and the Chicago attorneys were entitled to $4,159.72, and suggested that he would remit upon `our final accounting.' The Chicago firm immediately demanded *780 payment of the amount admitted to be due on the files returned to them. Respondent forwarded his check, dated January 14, 1960, drawn on The Whitney National Bank of New Orleans to the order of the Chicago firm, in the amount of $3,743.75, which was the amount due the client less the respondent's fees and the fees due the Chicago firm. Respondent's check was returned by The Whitney National Bank because of insufficient funds in the respondent's account. Respondent knew at the time that he drew the check that the account did not contain sufficient funds to cover the check, but explained that he was ill and did not have the opportunity to transfer funds to that account before it was presented for payment, and agreed to send a certified check to cover the deficiency immediately. When funds to cover the N. S. F. check did not arrive as promised, the Chicago firm dispatched a representative to New Orleans in an attempt to secure the remaining files in respondent's possession and to collect the amounts due on these files which had been settled.
"The representative of the Chicago firm spent January 25th and 26th, 1960, in New Orleans with the respondent, attempting to verify with him the amounts collected for the account of the client which had not been remitted. It was difficult to arrive at any conclusion because the respondent had, by letter dated January 23, 1960, transmitted what he contended were the remaining files in his possession to the Chicago firm, enclosing with his letter listings of the file numbers on which settlements had been made and showing the amounts collected thereon, totalling $6,983.63. At this time respondent agreed that there was due the client and the Chicago firm $10,064.59, and upon being pressed paid $2,250.00 in cash on account, but refused to pay the balance which he admitted was due. The Chicago firm later learned that the respondent had not returned a number of additional files on which he had received settlements. Further efforts on the part of the Chicago firm finally resulted in their securing from the respondent all of the files in his possession.[10] However, up until the commencement of the hearing before the Commissioner, respondent had made no payments on the recoveries admittedly made by him except for the cash payment of $2,250.00 delivered to the representative of the Chicago firm" in January of 1960. The final amount of $12,492.93 still due by Wheeler and not accounted for was not paid until May of 1961, as pointed out above in Footnote No. 6, which was after the charges were filed, after the hearings before the committee, and the first hearing before the Commissioner. (The emphasis has been supplied.)
"The respondent does not dispute any of the foregoing facts. He urges, however, that he is not guilty of the charges contained in Specification #1, contending that by returning the files and the lists enclosed with his letters of December 19, 1959, January 23rd and February 13th, 1960, he had reported and accounted for the money which he had collected. He further contended that he had no obligation to remit the funds because as a result of the Chicago firm's demands he had returned the files and had no records by which he could determine the amounts due him for fees and expenses.[11] In this connection, he insisted *781 that it was incumbent upon the Chicago firm to account to him for the amounts which he owed after giving him credit for fees, court costs and other unliquidated sums which he claimed were due him for telegrams and travel expenses. Respondent refused at any time to state the amount of these costs or to substantiate that any such sums were due him. (The emphasis has been supplied.)
"Respondent's attempted explanations for his conduct, in the Commissioner's opinion, are not valid and evidence a cynical attitude toward his obligation as a lawyer who has come into possession of funds belonging to others. The undisputed evidence conclusively establishes that for a period of over two years attempts were made to secure an accounting and remittance of the funds which he admitted that he had collected for The Atlantic Companies.[12] * * *.
"Any confusion in this case concerning the amount due respondent for costs out of the recoveries made by him were the direct result of his wilful failure to properly account for the funds which came into his possession. Although in testimony and by brief respondent has suggested to the contrary, the evidence in this case is quite clear that the Chicago firm at all times was entirely willing for the respondent to deduct his fees and reasonable costs from the amounts collected by him for The Atlantic Companies. After refusal for a period of two years to report and account for the monies collected, respondent certainly cannot now validly contend that because he returned the files it became the duty of those who had the files to account to him for his actions.[13]
"No satisfactory explanation was ever offered by the respondent for having drawn *782 the check dated January 14, 1960, on The Whitney National Bank of New Orleans, knowing full well that he had insufficient funds on deposit to cover the check. His explanation for this action was that at the time that he issued the check he was ill and although he intended to, he could not physically transfer funds to this account prior to it being presented for payment. Even conceding that illness and intention to transfer funds to an account justify drawing a check knowing that the funds are not then on deposit, the respondent offered no explanation as to why the check was never made good.[14] (The emphasis has been supplied.)
"The Commissioner finds that, by his own admissions, the respondent is guilty of the charges contained in Specification #1, with the exception of the charge that he violated his authority in reference to the settlement of claims."
With respect to respondent's violation of his obligations and responsibilities as a fiduciary by commingling with his own and converting to his personal use funds due his client, as set out in Specification No. 2, the Commissioner found that "although the respondent contends that he did in fact segregate the funds belonging to The Atlantic Companies and the Chicago firm, respondent's own testimony requires the conclusion that the committee has also proved this charge. Respondent testified that during the early stages of his relationship with the Chicago firm, the money which he collected was kept in a `special account.' He admitted, however, that the special account was not restricted to the funds collected for his client; and, it appears that his `special account' was not a trust account clearly identified as containing only those funds belonging to others. Inherent in respondent's testimony is the conclusion that he kept no books or records on the funds which he collected for The Atlantic Companies and that he could not possibly identify any specific amount deposited in his `special account' as representing payment for any particular claims received by him for the account of The Atlantic Companies.
"As a matter of fact, the respondent did not even maintain these funds in his own account subject to his own control. Handling the funds in the manner to which he testified is certainly far more serious than only having failed to maintain them *783 in a proper trust account. He testified that because of his own financial difficulties, late in 1956 he placed cash representing the funds collected by him in his mother-in-law's safety deposit box in The Hibernia National Bank in New Orleans, to which he had no right of entry and over which he had no control. He further testified that prior to his mother-in-law's death in the fall of 1958, he physically transferred the funds to a safety deposit box owned by one Henry J. Burt in a Louisville, Kentucky, bank. Henry J. Burt was reluctantly identified by the respondent as a friend and co-employee of his brother employed by the L. & N. Railroad. The respondent had no personal right of access to this safety deposit box and could not even testify with any particularity concerning the amount in the box or how the funds contained therein were identified. Canon 11 of the Canons of Professional Ethics provides in part that money of a client coming into the lawyer's possession `shall not under any circumstances be commingled with his own or be used by him.' Even accepting at face value the respondent's improbable testimony[15] as to his method of safekeeping the funds, as he is certainly guilty of not only having commingled the funds in violation of the Canon, but he is also guilty of having placed the funds beyond his own control or the control of his client.
"Presumably the respondent was attempting to prove by his testimony that he at no time converted the funds collected to his personal use. However, the Commissioner is of the opinion that the respondent's testimony is not believable since the record clearly shows that because of his own financial difficulties he used the funds and was in no position to replace them until May 16, 1961, during the hearings before the Commissioner.[16] No other conclusion is possible in the light of the respondent's letter to a representative of the Chicago firm, dated April 23, 1960. In this letter respondent admitted that since he had consummated the settlement of several matters which had been pending, he was in a position to `project' what he could do in connection with payment of the amounts due by him and that he would remit the funds prior to the end of April, 1960," which he never did. "He further recognized that it was to his interest to devote all of his `efforts' toward getting `some money' into `your (the Chicago firm's) hands as quickly as possible * * *.'[17]
"This letter written by the respondent at approximately the time the charges were instituted against him, was never explained by him and stands as mute evidence that his explanations in justification of his actions occurred to him only after the commencement of these proceedings." (The emphasis has been supplied.)
While we are in full accord with the Commissioner's observation in his report that the purpose of disbarment is not punishment, but the protection of the courts and the public, we cannot, in good conscience, follow his recommendation that the respondent only be suspended from the practice of law in this state for a period of two years following the finality of this case. The charges of which respondent was found guilty were not only of the most serious nature, reflecting gross professional misconduct and involving, as it did, a sizable amount of money belonging to his client and the forwarding law firm, which *784 Wheeler converted to his own use, but his attitude throughout has been one of cynical and utter disregard for his obligations as a lawyer, causing the Commissioner in his report to observe that Wheeler had, by his own testimony, "demonstrated * * * he not only failed to recognize the gravity of his actions but attempted to exculpate himself by laying the blame on the shoulders of those persons who were damaged by his improper conduct." This is a course of action, we might add, he continued to pursue when the case was argued before us, and even in a supplemental brief filed subsequent thereto. (The emphasis has been supplied.)
For the reasons assigned, it is ordered, adjudged, and decreed that the name of Thomas B. Wheeler, respondent herein, be stricken from the roll of attorneys and that his license to practice law in Louisiana be, and the same is, hereby, cancelled. All costs of this proceeding is to be paid by the respondent, Thomas B. Wheeler.
SANDERS, Justice (concurring in part and dissenting in part).
I fully concur in the conclusion that the respondent attorney has been guilty of professional misconduct that warrants disciplinary action. However, the record reflects that this is the first complaint made against him in twenty years of professional service. Restitution has been made. In view of these and the other circumstances of this case, I am of the opinion that suspension of the respondent for a period of two years (as recommended by the Commissioner) is the proper disposition. Such a suspension in the instant case will, in my opinion, achieve the primary objective of all disciplinary proceedings against members of the legal profession: the protection of the courts and the public. No greater penalty should be imposed than that which is required to accomplish this purpose. See In Re Craven, 204 La. 486, 15 So.2d 861 and In Re Novo, 200 La. 833, 9 So.2d 201.
NOTES
[1] These are the Atlantic Mutual Insurance Company and the Centennial Insurance Company.
[2] See, Section 10 of Article VII of the Louisiana Constitution of 1921, and pages 377-389 of Volume 21 of the Louisiana Revised Statutes, together with appropriate supplements thereto, particularly Section 9 of Article XIII of the Articles of Incorporation of the Louisiana State Bar Association.
[3] Section 10 of Article VII of the Louisiana Constitution of 1921.
[4] In the recent case of Louisiana State Bar Association v. Wood, La., 141 So.2d 828, this court held that the party failing to except to the commissioner's report within twenty days after it is lodged in the court, that report, under Section 9 of Article XIII of the Articles of Incorporation of the Louisiana State Bar Association, stands confirmed. In the instant case the twentieth day, not counting the day on which the report was filed, fell on a Sunday, and the respondent's objection and exceptions thereto were not lodged with the court until the next day, which was the twenty-first day.
[5] Handlin v. Dodt, 110 La. 936, 34 So. 881; In re Weber, and Louisiana State Bar Association v. Steiner, both supra.
[6] Significantly, respondent paid on May 16, 1961 (after the first of the four hearings before the Commissioner), the sum of $12,492.93, not in an effort to make amends for his illegal and unethical professional conduct as established in the hearings, but in settlement of a civil suit for this exact amount filed against him on April 26, 1961, by the Chicago firm.
[7] The first specification charges that Wheeler "on or about July of 1954 * * * did enter into an agreement with the firm of Heineke, Conklin & Schrader, Attorneys for The Atlantic Companies, to represent the said Atlantic Companies in the settlement and processing of claims on ocean marine cargo policies underwritten through them. That the said agreement entered into * * * stipulated the fee, and, subsequently, your authority to settle claims. That from about July of 1954 and to the year 1956 several hundred of such matters were forwarded to you for handling. That subsequently: 1.) You failed and refused to render to your client, or to your client's counsel, a statement of status of the various claims; and this, in spite of repeated demands; 2.) That upon demands by the client, through its counsel, to release the matters being handled by you, you did fail and refuse to release the said matters; 3.) That you did issue your check dated January 14, 1960, in the amount of $3,743.75 payable to the order of Heineke, Conklin & Schrader, in part payment of the accounting due them on behalf of their client, The Atlantic Companies; that the said check was returned by the drawee bank, N. S. F.; 4.) That by your own admission under date of June 23, 1960, or some six years subsequent to the entering into the agreement, you were then at that time indebted to the said client, through their counsel, to the extent of some $11,782.00 for monies collected by you as attorney for the client's account, subject to a payment in the amount of $2,250.00, and certain advanced costs and unpaid fees; 5.) That you to this date fail and refuse to render a proper and adequate accounting, or to remit the funds collected by you, to the said counsel for the client. 6.) That you repeatedly violated your authority in reference to the settlement of your client's claims." The second specification charges that Wheeler, in his fiduciary capacity as attorney "received sums of money for the account of your client and that you commingled these funds with your personal funds; that you violated your obligations and responsibilities as a fiduciary by converting funds belonging to your client to your personal use."
[8] Although the list furnished by the Chicago firm reflected, according to its calculations, Wheeler still had in his possession some 391 claim files, exclusive of those on which money had been paid, Wheeler turned over to the New Orleans attorneys only about 86 of these. It appears that with one or two exceptions, all of these had been closed, were in litigation, or had prescribed because of Wheeler's failure to take timely action, and were otherwise dead. Wheeler never did turn over to the New Orleans attorneys the 268 files he still had. Further, in checking the 10 to 12 claims presumedly in litigation, the New Orleans attorneys found Wheeler had actually compromised one for $500 without making any report on or remittance in connection with his collection of this amount.
[9] It was not until the letter of December 19, 1959, was received that the Chicago firm had actual admission that Wheeler had, indeed, recovered money from carriers which he had either failed to remit or even report onsome as far back as 1955. This was the firm's first knowledge with respect to almost all of these collections.
[10] It appears that even at the time of the hearings there were still some four files still missing, for which Wheeler had never accounted.
[11] In addition to admitting in January 1960 he owed the client and the Chicago firm $10,064.59, Wheeler, on April 23, 1960, significantly wrote the firm to the effect that he would, before the end of the coming week, "send you a certified check for around five thousand dollars. I will send you the balance due before the end of the month," adding this was the first time since he had been practicing law that he had "ever had serious financial troubles." He even admitted that he was "fully aware of the seriousness of this situation and the fact that your decision as to your course of action is of crucial importance to me. It seems to me that at this state the best interest of all concerned can best be served by my devoting all of my efforts towards getting some money into your hands as quickly as possible, and that I am doing." No further money was ever sent, however, and only during the hearings before the Commissioner was in excess of $12,000 paid by Wheeler in settlement of the civil suit filed in April of 1961. It seems obvious that the change in Wheeler's attitude from that reflected by this letter and in his appearance in this case is due to the fact that the Chicago firm had, on April 20, 1960, just previous thereto, and apparently unknown to Wheeler, filed its complaint with the Committee on Professional Ethics and Grievances.
[12] Pointing out that Canon 11 of the Canons of Professional Ethics provides in part that "The lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client," and, further that "Money of the client or collected for the client or other trust property coming into the possession of the lawyer should be reported and accounted for promptly * * *," the Commissioner stated it was his opinion this merely expressed "the inherent duty and great responsibility resting upon a lawyer to make a detailed and accurate account of all monies received by him, and to pay sums promptly, less other proper fees and disbursements." He cites In re Novo, 200 La. 833, 9 So. 2d 201; Poulson v. Blanchard, 6 La.App. 101; and 7 C.J.S. Attorney and Client § 133, p. 973.
[13] Actually, Wheeler had some or all of these files in his personal possession during the period from August 1954 to March 1960, a period of almost six years, and, in fact, has still been unable to account for four of the files. During almost three years, beginning with January of 1957, when the Chicago firm became alarmed and began to thoroughly investigate the status of Wheeler's work, he made no serious effort to account for the monies he now admits were collected by him, but, instead, hindered an accounting with the Chicago firm at almost every step. The record discloses that after Wheeler was written in January 1957 with respect to an accounting or status report, the firm in March following, with positive knowledge he had settled with its authorization a claim in excess of $600, demanded that he remit this money or account for it. He wrote in May he had this money in a "special account" and would send it in two weeks. He never did. It was not until October 1960 that he finally released some 86 files to the New Orleans attorneys, and it was not until December 1959 that he sent the first batch of files to Chicago, thus making it possible for that firm to determine for the first time he had collected on many claims over the years for which he had never accounted. It was only in March 1960 that he finally turned over to the firm all but the four missing files. This was more than three years after the first demand for an accounting in January 1957, during which years he had some or all of the files in his possession and could have, from them, secured the information necessary for an accurate accounting, particularly since he alone knew the amounts expended as costs in connection with the collection of the claims, and for which he claimed during the hearings he was entitled to reimbursement.
[14] Respondent's attempted explanation is that the $2,250 he paid the representative of the Chicago firm in his office in New Orleans toward the end of January 1960 was in compromise of the NSF check, but the record fails to substantiate such contention. The NSF check, dated January 14, 1960, was a purported payment of the amount Wheeler admittedly owed as reflected by his letter of December 19, 1959, and the files accompanying it, i.e., $4,991.66, less his and the Chicago firm's fees in connection with this amount. The check had been sent in response to the firm's demand for immediate payment of the amount due and had been returned as NSF at the time the firm sent its representative to New Orleans the latter part of January. After going over the matter, Wheeler at that time admitted he had collected and not accounted for funds in excess of $10,000. It was only after payment of the entire amount was demanded within 24 hours that he paid the $2,250 in cash, presumably the only amount he could then raise. Wheeler told the firm's representative at this time he had sent ALL OF THE FILES to Chicago, but the representative learned upon returning to Chicago Wheeler had still not surrendered or accounted for 158 claim files.
[15] Respondent produced not one single witness to corroborate his stand in this respect, neither his wife, his brother, his secretary, or Henry J. Burt; and as improbable as his stand was, it was his burden to establish it by clear and convincing evidence and testimony, which he totally failed to do.
[16] This was in settlement of a civil suit instituted in April 1961, and not because of the grave charges brought against him, as pointed out above in Footnote No. 6.
[17] This letter is quoted and discussed more fully in Footnote No. 11.