530 So.2d 1138 (1988)
LOUISIANA STATE BAR ASSOCIATION
v.
Edward C. ALKER.
Nos. 87-B-0884, 87-B-2023.
Supreme Court of Louisiana.
September 12, 1988.
*1139 Thomas O. Collins, Jr., G. Fred Ours, New Orleans, Gerard F. Thomas, Jr., Natchitoches, Roland J. Achee, Shreveport, Robert J. Boudreau, Lake Charles, Robert M. Contois, New Orleans, Frank J. Gremillion, Baton Rouge, Carrick R. Inabnett, Monroe, Harvey Lewis, New Orleans, Alfred S. Landry, New Iberia, Philippi P. St. Pe Metairie, for applicant.
Edward C. Alker, Metairie, for respondent.
LEMMON, Justice.
These are consolidated disciplinary proceedings by the Louisiana State Bar Association against a currently disbarred attorney.[1] The specifications concern respondent's misconduct relative to seven separate clients prior to his disbarment.
After two separate hearings, which respondent failed to attend, the commissioner appointed by this court submitted findings of facts and conclusions of law, recommending that respondent be disbarred. The Association generally concurred in the findings and conclusions, except as delineated below, and concurred in the recommendation of disbarment, but requested that restitution be required as a condition of reinstatement.
The evidence as to each client will be reviewed separately.
The Anweiler Matter
The specifications as to this client alleged that respondent charged excessive fees in settling a worker's compensation case in violation of DR 2-106, failed to render an accounting of the client's funds and converted the funds to his own use in violation of DR 1-102 and DR 9-102, and entered into business transactions with his client wherein he and the client had differing interests in violation of DR 5-104 of the Code of Professional Responsibility.[2]
Respondent contracted with the client to handle a claim against Avondale Shipyards for an on-the-job injury aboard a vessel on drydock. The contract provided for a contingency fee of 40% of the recovery. The *1140 documents indicated two different accident dates and two different locations for the accident. No suit was ever filed under the Jones Act or the Louisiana Worker's Compensation Act.
The claim was settled for $35,000 by a joint petition for worker's compensation compromise almost three years after the accident. In the receipt and release, the client agreed to pay attorney's fees to respondent of $7,500, in addition to the $4,500 fee for the worker's compensation settlement.[3] The release stated that the additional fee was for legal services over two years, including evictions, land leases, property negotiations and other business transactions. The release further stated that the claim against Avondale was really a Jones Act claim which was treated as a compensation settlement "because it was expedient".
Respondent deposited the check in his bank account, but never rendered an accounting of the disbursement of the settlement funds to the client. He apparently withdrew his fee, but never disbursed the full amount of the settlement funds (whether the fee due was $4,500 or $12,000).[4] Instead, respondent borrowed $10,000 from the proceeds of the settlement. He eventually repaid the client $5,000 and gave the client a note for $5,000. The client ultimately filed suit to collect on the note.[5] The client also denied that he owed respondent any amount for other legal services.
The commissioner found that respondent's failure to render an accounting of the disbursement of the funds and his failure to pay the full amount of the client's portion of the settlement proceeds to the client constituted a violation of DR 9-102(B)(3) and (4). In addition, the commissioner concluded that respondent's borrowing $10,000 from the client out of the settlement funds constituted a violation of DR 5-104(A) by entering into a business transaction with differing interests without the consent of the client after full disclosure.
After reviewing the record, we conclude that the Association proved by clear and convincing evidence the violations found by the commissioner. As to the business transaction, respondent in his answer stated that the client acquiesced in the loan because the interest rate was higher than could be obtained from a financial institution. It is unclear how fully informed the client was when he entered into this transaction. However, DR 5-104(A) generally prohibits a lawyer from entering into a business transaction with the client when they have differing interests. See Louisiana State Bar Association v. Bosworth, 481 So.2d 567 (La.1986). When charged with violating DR 5-104(A), an attorney who wishes to avail himself of the exception (consent after full disclosure) has the burden of proof by a preponderance of the evidence. Here, respondent failed to prove the client's consent after full disclosure.
The commissioner further concluded that the Association failed to prove respondent charged an excessive fee, noting the nebulous nature of the claim involved. The Association contests this finding.
While the claim was settled by the filing of a petition for worker's compensation compromise, the release contained a settlement of all claims arising from the accident and referred to other legal services for which respondent was to receive $7,500. Because of the release signed by the client, as well as the general confusion surrounding the claim from the outset and the prescription issue and other problems *1141 with the litigation, we conclude that the specification of charging an excessive fee was not proved by clear and convincing evidence.
The Sumlin Matter
The specifications in this matter alleged commingling and conversion of the clients' settlement funds in violation of DR 1-102 and DR 9-102.
Respondent negotiated settlements of the clients' personal injury claims. In April, 1985, respondent received two settlement drafts from one insurer in the amounts of $3,500 and $10,000. He deposited the drafts in his bank account and prepared an accounting statement of the disbursement of the funds. The statement indicated that the sums of $475 and $1,140 were withheld for payment of Dr. Philibert's bills, but these bills were never paid.
In September, 1986, respondent received a check in the amount of $13,026.64 in settlement of a judgment against another insurer. He did not deposit the check in a trust account, but converted the funds into cashier's checks to pay costs, attorney's fees and medical bills. A check in the amount of $250.00 payable to Dr. Philibert was not sent to the physician, but was cashed and endorsed by respondent "not used for purposes intended". The record does not indicate how the $250 was used.
The commissioner concluded respondent's withholding of the sums of $475 and $1,140 from his clients' funds to pay medical bills which were never paid constituted conversion of the funds in violation of DR 9-102 and DR 1-102. The record clearly establishes these violations.
As to the $250 withheld from the 1985 settlement, the commissioner concluded that commingling and conversion had not been proved, noting that respondent had rendered a handwritten accounting and that the record does not establish the ultimate disposition of the $250. The Association contests this conclusion.
When the Bar Association proves that the attorney failed to deposit his client's funds in an identifiable bank account, the burden is on the attorney to show there was no conversion of the funds to his own use. Louisiana State Bar Association v. Krasnoff, 488 So.2d 1002 (La. 1986); Louisiana State Bar Association v. Williams, 512 So.2d 404 (La.1987). Here, the record shows that respondent was in possession of $250 belonging to his client, and his failure to show the disposition of the funds results in failure to meet his burden of proof that the funds were not converted. We therefore conclude that respondent converted $250 of the clients' funds to his own use.
The Riley Matter
This specification charged respondent with mishandling and converting the client's funds received in settlement of a worker's compensation claim in violation of DR 1-102 and 9-102.
In August, 1984, respondent received a settlement draft in the amount of $15,856.19. He deposited the draft in his bank account, but did not disburse or account for the funds, telling the client that the draft had not cleared the bank.[6] Approximately one year later, respondent received another check for the client in the amount of $9,143.81. Respondent also deposited this check in his bank account. When the client confronted respondent with a copy of the cancelled 1984 draft, respondent gave the client $8,000 in cash, in addition to a note for $4,875, and later paid additional sums.[7] At the time of the commissioner's hearing, respondent had still not paid the client the total amount due him.
The commissioner concluded that respondent did not render an accounting for the proceeds of the settlement drafts and did not pay the client the full amount of funds *1142 due him from the settlement.[8] The commissioner further concluded that respondent's handling of the settlement proceeds violated DR 1-102 and DR 9-102 and constituted conversion. The record clearly establishes these violations. Furthermore, the misconduct was aggravated by respondent's lying to his client about the status of the 1984 draft.
The Young Matter
The specifications concerning this client charged respondent with commingling and converting the client's funds in violation of DR 1-102 and 9-102 and with charging an excessive fee in violation of DR 2-106.
Respondent was employed to collect the proceeds of two life insurance policies after the death of the client's husband. Although the insurers did not contest the claim, respondent entered into an employment contract calling for a 40% contingency fee.
Respondent received two drafts after a routine demand upon the insurers, one for $25,000 and one for $5,000, and deposited them in his bank account. When the client protested the amount of the fee, respondent offered to pay her $12,000 as her full share of the settlement proceeds. The client rejected the offer and obtained other counsel, who filed suit to recover the funds. The client has never received any of the proceeds of the policies.
The commissioner concluded that respondent was guilty of conversion of the client's funds in violation of DR 9-102 and of attempting to charge a clearly excessive fee in violation of DR 2-106.
The record clearly supports a conclusion that respondent attempted to charge an excessive fee for his services. As to the conversion of the client's funds, a check representing the proceeds of a compromise belongs in part to the client and in part to the lawyer and must be deposited in a trust account. DR 9-102(A)(2). The lawyer must also promptly and unconditionally tender the portion which represents the client's share of the funds. DR 9-102(B)(4). If there is a dispute between the lawyer and the client over the amount of the fee, the lawyer, in addition to unconditionally tendering the amount which is undisputedly the client's share of the funds, must maintain the disputed portion of the fee in the trust account until the dispute is resolved. DR 9-102(A)(2).
Here, respondent violated DR 9-102(A)(2) by withdrawing the disputed portion of the fee from the bank account.[9] Respondent was only entitled to withdraw the amount of his fee that was undisputedly earned and was required to leave the disputed portion of the fee in the trust account until the dispute was settled. Respondent further aggravated the situation not only by using the disputed portion of the fee for his own purposes, but also by refusing to turn over unquestionably to the client the portion of the funds which undisputedly belonged to the client. Indeed, respondent's attempt to hold the client's share of the funds as leverage to settle the fee dispute with the client was particularly reprehensible.
The Hargesheimer Matter
These specifications charge respondent with improper handling and conversion of a client's funds received from the sale of the client's truck in violation of DR 9-102 and with charging excessive fees for handling several criminal matters in violation of DR 2-106.
Respondent received $12,000 cash and a $4,000 note from the purchaser of the client's truck. Respondent deposited the cash in his bank account on May 7, 1985. At the commissioner's hearing both the client and his mother testified that respondent had tendered $2,000 or less from the truck sale and that the mother had repeatedly sought an accounting. Respondent *1143 presented no verifiable documentation of additional funds paid to the client.[10]
The commissioner found that respondent commingled and converted the client's funds in violation of DR 9-102(B)(4) and failed to render an accounting in violation of DR 9-102(B)(3).[11] The record clearly supports these violations.
As to the excessive fee issue, respondent represented the client in several criminal matters, including three in district court and two in parish court. Respondent attempted to charge a fee of $64,650 for services in these matters. He gave the client a bill which showed only dates and hours, with no reference to any particular case or the type of services which were rendered.
The commissioner, although questioning the correctness of the fee, concluded that the evidence was insufficient to establish that respondent had attempted to charge an excessive fee. The Association contests this finding.
In the first case involving a misdemeanor charge of possession of marijuana which allegedly occurred on June 7, 1985, respondent appeared in court twice for arraignment and once to enter a guilty plea. No motions were filed. In the second case involving misdemeanor charges of aggravated assault and simple battery on a police officer on May 6, 1985, respondent appeared for arraignment on August 23, 1985, and the state dismissed the charges on October 21, 1985. No motions were filed. In the third case involving a felony charge of illegal possession of a sawed-off shotgun on May 6, 1985, relator filed a motion for continuance and tried a motion to suppress before being replaced as counsel. The two cases in parish court involved charges of driving while intoxicated, speeding (25 miles over the speed limit) and driving with an expired license, all of which allegedly occurred on June 7, 1985. Respondent filed motions, but did not complete the representation.
The client testified that respondent presented the bill for $64,650 when he demanded that respondent pay the balance due from the sale of the truck.
Respondent was served with a pleading in this proceeding which alleged that he had attempted to charge an excessive fee of approximately $64,000 for handling several criminal cases for this client between March 15 and June 23, 1985. The evidence presented by the Association consisted of respondent's bill, the records of the criminal cases, and the testimony of the client and his mother. Most of the bill encompassed dates before the crimes were allegedly committed, and there was little evidence of other services rendered by respondent.[12] The services shown by this record to have been performed by respondent on the five criminal cases for which he was accused of charging an excessive fee clearly does not warrant a $64,650 fee.
Once the Association made this prima facie showing of an excessive fee, respondent had the burden of going forward with evidence that services were performed which justified the fee. Respondent's failure to produce such evidence warrants the conclusion that he attempted to charge an excessive fee.
The Brumfield Matter
In this matter respondent was charged with commingling and converting funds from an insurance settlement draft and failing to render an accounting in violation of DR 1-102 and 9-102.
*1144 The insurance settlement draft for $3000 was payable to and endorsed by the client. Respondent cashed the draft in April or May of 1985, but did not pay the client his share of the funds until December, 1985, at which time an accounting was also rendered. Respondent's letter to the Association states that he tried to contact the client by letter on July 12, August 19 and December 11 (the latter by registered mail) in order to disburse the funds. The client denied receiving any of the letters. Significantly, the client admitted he had lived out of state for part of the time and may have been difficult to reach until December.
The commissioner found that the Association failed to prove any ethical violation as to this client. The Association contests this finding. After reviewing the evidence, we conclude that respondent failed to deposit the client's funds in an identifiable bank account in violation of DR 9-102(A). However, in view of respondent's attempts to contact the client during the time the client was admittedly difficult to find, we further conclude the Association did not prove by clear and convincing evidence that respondent failed to pay the funds timely upon request of the client as required by DR 9-102(B)(4).
The Cook Matter
The specifications as to this client allege that respondent was guilty of dishonest conduct prejudicial to the administration of justice in violation of DR 1-102, neglecting a legal matter entrusted to him in violation of DR 6-101, and knowingly making false statements in a pleading in violation of DR 7-102.
Respondent was hired by Mr. Cook to handle the adoption of Mrs. Cook's two children from a previous marriage and to have their names changed. Respondent was paid $3,500 for his services, but never filed a petition for adoption. On October 5, 1979, respondent prepared an Act of Adoption which was executed by the parties. On December 21, 1980, respondent filed a petition to change the name of each child, alleging that Mr. Cook had adopted the children.[13] Mr. Cook died on October 5, 1981. In February, 1984, respondent filed the Act of Adoption in the district court.
Mrs. Cook filed a complaint with the Association in January, 1985. Respondent's handwritten response asserted that the work had been completed and filed in court in February, 1984. A subsequent typewritten response explained that he had drafted a suit for step-parent adoption based on the legal father's failure to support the children, but learned that the legal father had in fact provided child support and would contest the adoption. He asserted his belief that Mr. Cook's health would not have permitted him to go through a court battle over the adoption and averred that Mr. Cook himself "stopped the adoption proceedings".
The commissioner found that respondent had been requested to prepare the adoption proceedings on many occasions and had neglected the legal matter entrusted to him in violation of DR 6-101(A)(3). The commissioner further found that the Act of Adoption which respondent ultimately prepared was one which respondent should have known was patently invalid and that this action constituted deceitful and dishonest conduct which was prejudicial to the administration of justice in violation of DR 1-102. The evidence clearly establishes these violations. Furthermore, respondent has made no effort to return the fee which he had collected for the services he failed to perform.
Discipline
Disciplinary proceedings are not primarily to punish the lawyer, but to protect the courts and the public from unprofessional conduct. Louisiana State Bar Association v. Alker, 491 So.2d 1328 (La. 1986). A penalty for misconduct by a lawyer deters future misconduct, protects the public from such misconduct, and maintains confidence in the legal system.
*1145 Misuse of a client's funds is a serious act of misconduct. In Louisiana State Bar Association v. Hinrichs, 486 So.2d 116 (La. 1986), this court established guidelines for determining the appropriate penalty in cases of commingling and conversion of clients' funds. Disbarment is usually appropriate when one or more of the following elements are present: the lawyer acts in bad faith and intends a result inconsistent with his client's interest; the lawyer commits forgery or other fraudulent acts in connection with the violation; the magnitude or the duration of the deprivation is extensive; the magnitude of the damage or risk of damage, expense and inconvenience caused the client is great; the lawyer either fails to make full restitution or does so tardily after extended pressure of disciplinary or legal proceedings.
Here, the evidence showed a pattern in which respondent failed to account for clients' funds and delayed or totally failed in paying the funds to the client. He converted the funds of five clients to his own use. In one case he lied to the client about the status of an insurance draft, and in another he withheld the client's share of life insurance proceeds and used the withheld funds as leverage in attempting to collect an excessive fee. In one case he borrowed funds from a client without full disclosure and has failed to repay the funds. In another he failed to pay the client's funds promptly, finally giving a note (which remains unpaid) in partial payment. Various amounts are still owed to at least five clients who have suffered considerable damage and inconvenience, and some have filed civil actions to recover these debts. Additionally, respondent attempted to charge excessive fees in two cases and deceitfully filed a notarial act in another which he should have known was patently invalid.
Moreover, respondent's mishandling of clients' funds represents a continuation of the pattern of misconduct for which he was disbarred in Louisiana State Bar Association v. Alker, supra. In addition to prior disciplinary offenses and a pattern of misconduct, other aggravating factors include substantial experience in the practice of law, vulnerability of the victims, multiple offenses, and indifference in making restitution. Standards for Imposing Lawyer Discipline § 9.22 (1986).
Disbarment is clearly warranted in this case.
The Association further contends that respondent should be required to make restitution in the amount of $62,715.[14]
A requirement of restitution in the order of disbarment arguably might encourage more prompt or more diligent efforts at restitution. Nevertheless, the extent and the timing of restitution (or efforts to make restitution) are normally important factors to be considered in reviewing a lawyer's application for reinstatement, which may be filed no earlier than five years after disbarment. Articles of Incorporation, Louisiana State Bar Association art. 15, § 12(a).[15]
The requirements for reinstatement include proof of the lawyer's fitness to resume practice and of his good moral character. Because the fact of restitution is relevant to a determination of the *1146 present fitness of a lawyer to practice law and may be indicative of his moral character and his rehabilitation during the period after disbarment, the preferable time for weighing the entire matter of restitution is in the reinstatement proceeding, rather than in the disbarment proceeding. Additionally, every lawyer may not realistically be able to make full restitution, and each application for reinstatement should be considered on an individual basis.[16]
We therefore decline at this time to impose a requirement that respondent must make restitution before applying for reinstatement. If and when respondent applies for reinstatement, he must set out in his petition a statement of the status of restitution of funds and the extent and timing of his efforts at restitution. This court will determine at that time the weight to be given restitution efforts or the lack thereof.
Decree
Accordingly, the five-year minimum period which must elapse after disbarment before respondent may apply for reinstatement is extended until five years have elapsed since the finality of this judgment. All costs are assessed against respondent.
NOTES
[1] Jurisdiction over respondent falls under this court's original jurisdiction. La. Const. art. V, § 5(B). The decision in Louisiana State Bar Association v. Krasnoff, 502 So.2d 1018 (La. 1987), held that this court may exercise jurisdiction over a disbarred attorney for misconduct which occurred prior to disbarment, when the misconduct had not been included in the prior proceeding, in order to promote judicial efficiency and to fulfill the purpose of disciplinary proceedings of protecting the public and the administration of justice.
[2] The Code of Professional Responsibility has been replaced by the Rules of Professional Conduct, effective January 1, 1987. The alleged misconduct, however, occurred before the adoption of the new rules.
[3] The maximum permissible fee on a $35,000 recovery in a worker's compensation case was $4,500. See La.R.S. 23:1141.
[4] The commissioner found that, although the evidence was unclear, respondent charged a fee of at least $7,000 and as much as $12,000.
[5] When the attorney fails to render an accounting of a client's funds and does not appear at the hearing in the disciplinary proceeding, it is difficult to determine the amount of funds which are still owing to the client. Here, in his suit against respondent the client sought recovery of the $7,500 excess fee and the $5,000 unpaid balance on the note, indicating that respondent probably paid him the remainder of the settlement proceeds.
[6] By December, 1984, the balance in the account fell below $1,500, indicating that respondent had converted these funds to his own use.
[7] At the commissioner's hearing, the client admitted receiving the $8,000, in addition to $1,500 previously borrowed from respondent and to $500 and $1,000 subsequently paid to the client and his wife respectively.
[8] Again, because of the absence of an accounting and respondent's failure to appear at the hearing, it is difficult to determine the amount still owing to the client. Apparently the $4,875 note represented the deficit in the disbursement of the settlement proceeds.
[9] Because respondent's bank account during this period fell far below the $30,000 level, it is clear that respondent withdrew both the client's share of the funds and the disputed portion of the fee and converted these to his own use.
[10] Respondent sent the Association a handwritten note, purportedly written by the client on August 23, 1985, to the effect that respondent had paid all but $336 of the proceeds of the sale of the truck. However, except for proof of payments totaling less than $2,000, respondent never provided any other accounting for the funds or proof of other payments.
[11] Again, because of the absence of an accounting or an appearance by respondent, it is difficult to determine the amount which is still owing to the client. If $2,000 of the $12,000 cash proceeds has been paid, the balance of $10,000, minus any fees and costs, is still owing.
[12] Respondent also handled a bankruptcy case for this client, but on a contract basis for a fixed fee (and not on an hourly rate). After payment of an advance deposit, the client owed a balance of $1,800 (according to the bankruptcy petition) at the time of the filing.
[13] The commissioner found that this statement, although false, was inadvertently included in the pleading and did not constitute knowingly making a false statement. The Association concurred in this finding.
[14] The Association suggests the following amounts of restitution are appropriate:

Anweiler$7,500 (the excessive fee) Sumlin$1,863 (the amount not paid to the doctor) Riley$7,000 ($25,000 less a one-third fee, less $8,000 and $1,500 payments) Young$29,500 ($30,000 less a $500 fee) Hargesheimer$13,350 ($16,000 less $1,000, less $1,650 fee for criminal cases) Cook$3,500 (the entire unearned fee)
[15] See also art. 15, § 12(c), relating to applications for reinstatement. Section 12(c) provides in pertinent part:

"The information required concerning the petitioner may include any or all of the following matters in addition to such other matters as may be reasonably required to determine the fitness of the petitioner to resume the practice of law: criminal and civil judgments; disciplinary judgments; copies of income tax returns together with consents to secure original returns; occupation during disbarment and information in connection therewith; financial statement; statement of restitution of funds which were the subject matter of disciplinary proceedings. (emphasis added)
[16] While the making of, or the failure to make, restitution is a matter for serious consideration by the court on an application for reinstatement to the bar, the weight of authority does not make it the controlling consideration. Annot., 70 A.L.R.2d 268 (1960).

There should be no hard and fast rule governing the subject of restitution, but each case should be considered and dealt with in the light of its own circumstances. In Re Harris, 88 NJL 18, 95 A. 761 (1915). Nevertheless, in cases involving misappropriation of funds, restitution is an important consideration. While restitution alone will not ordinarily justify reinstatement, it is only under exceptional circumstances that reinstatement should be allowed in the absence of restitution or of a diligent and timely effort to accomplish restitution. In Re Dawson, 131 So.2d 472 (Fla.1961).