538 So.2d 156 (1988)
LOUISIANA STATE BAR ASSOCIATION
v.
Geoffrey LONGENECKER.[*]
Nos. 87-B-0585, 87-B-2061.
Supreme Court of Louisiana.
October 31, 1988.
On Application for Rehearing February 23, 1989.
*157 Thomas O. Collins, Jr., G. Fred Ours, New Orleans, Gerard F. Thomas, Natchitoches, Roland J. Achee, Shreveport, Robert J. Boudreau, Lake Charles, Robert M. Contois, New Orleans, Frank J. Gremillion, Baton Rouge, Carrick R. Inabnett, Monroe, Harvey Lewis, New Orleans, Alfred S. Landry, New Iberia, Philippi P. St. Pe, Metairie, for applicant.
Geoffrey Longenecker, Covington, Cecil M. Burglass, Jr., New Orleans, for respondent.
LEMMON, Justice.
This is a disciplinary proceeding by the Louisiana State Bar Association, through its Committee on Professional Responsibility, against one of its members based on alleged violations of the Code of Professional Responsibility.[1] The proceeding involved respondent's dealings with two separate clients.
The Hummer Matter
William Hummer hired respondent's firm to represent him in a claim against his insurer for fire damage to his residence. Before consulting legal counsel, the client had allegedly rejected an offer by his fire insurer to pay $51,000 under its policy, which provided limits of $90,000 for property damage.[2]
Respondent's partner in the two-partner firm had previously represented the client in other matters, but respondent was given responsibility for this case because of his expertise in fire insurance cases. The fee arranged between respondent's partner and the client for the insurance case was one of the disputed factual issues in the present proceeding.
During the pendency of the insurance matter, respondent's partner represented the client and others in a criminal matter. The client agreed to pay a total fee of $13,000 for the criminal matter, to be subtracted from any amount collected in the insurance case.
Respondent filed the civil action against the fire insurer. Upon respondent's demand and at the suggestion of the judge at a pretrial conference in January, 1985, the insurer issued a draft in the amount of $66,335.24 in payment of the portion of the claim that the insurer admitted was due. The draft was payable jointly to respondent, the client and the company holding a mortgage on the damaged property. Respondent placed the endorsements of all payees on the draft and deposited it into the firm's trust account. However, neither respondent nor his firm ever furnished the client with a written accounting for the funds.
Respondent at his partner's direction issued a check in the amount of $25,000 to the client from the firm's trust account on February 21, 1985 and another check in the amount of $2,000 to the client from the firm's operating account on March 11, 1985.[3] Between the January, 1985 receipt of the insurer's draft and February 27, 1985, three checks in the total amount of $30,000, representing fees attributable to the client's case, were issued by respondent from the trust account and made payable to the firm's operating account.[4] Respondent also issued two checks totaling $4,500 to an appraiser as advance payments for expert services to be performed in the client's case. Neither respondent nor his *158 partner paid the mortgagee the $16,400 balance as requested by the client.
Respondent's firm was dissolved on March 1, 1985, and respondent's partner took over the handling of the client's insurance case. The case was settled shortly thereafter, with the insurance company issuing a draft in the amount of $19,400 payable to the client and respondent's partner. Respondent's partner endorsed the draft and turned over the entire proceeds to the client, without determining whether the mortgagee had been paid the balance due on the mortgage.
As a result of subsequent litigation by the mortgagee against respondent's firm and the bank which had honored the $66,335.24 check on the basis of respondent's unauthorized endorsement, the bank paid the mortgagee in full and charged the payment to respondent's account.[5]
The Bar Association charged respondent (1) with endorsing the name of the mortgagee on the settlement draft without authority, failing to render an accounting to the client of these funds, and engaging in conduct that adversely reflects upon respondent's fitness to practice law, in violation of Disciplinary Rules 1-102(A)(6) and 9-102(B)(3); (2) with failing to pay the client the funds due to him and failing to pay the mortgagee as directed by the client, in violation of DR 9-102(B)(4) and 6-101(A)(3); (3) with paying $4,500 of the client's funds to an expert who never performed any services in the client's case, in violation of DR 1-102(A)(4) and (6); and (4) with commingling and converting the client's funds to his own use, engaging in conduct involving fraud and deceit, and engaging in conduct that is prejudicial to the administration of justice, in violation of DR 1-102(A)(4), (5), (6) and 9-102(A) and (B).
As to the first specification, the commissioner found that respondent had placed the endorsement of the mortgagee on the settlement draft without the authority of the mortgagee and consequently violated DR 1-102(A)(6). The commissioner also concluded that since respondent was not aware of the true nature of the fee arrangement with the client, he was not in a position to make an accounting and did not violate DR 9-102(B)(3).
The Association proved by clear and convincing evidence that respondent was not authorized to endorse the draft for the mortgagee. The evidence further established that respondent was generally handling the firm's bank accounts at the time, that he was responsible for handling this particular case (although Hummer was his partner's client), and that respondent received and handled the draft at issue. Although respondent claimed that he did not know the fee arrangements between his partner and the client and simply issued the checks as directed by his partner, respondent nevertheless at least shared the responsibility for delivering the client his share of the funds and rendering an accounting to the client regarding the funds from the partial payment. To this extent respondent was partially responsible for the firm's failure to render an accounting of the funds.[6]
As to the second specification, the commissioner concluded that the true fee arrangement between the parties was a forty per cent contingency fee on the total recovery, as evidenced by the written contract signed by the client. Therefore, since the $27,000 actually received by the client from the $66,335.24 payment by the insurer was an overpayment, there was no violation of DR 9-102(B)(4). The commissioner did find, however, that respondent's failure to pay the mortgage, as directed by the client, violated DR 6-101(A)(3).
The fee arrangements, as previously noted, were greatly disputed.[7] The Bar Association, *159 which bore the burden of proof, called the insurer's attorney, but failed to question him about any settlement offer prior to suit. The only evidence as to this offer was the self-serving testimony of the client and the somewhat discredited testimony of respondent's partner. On the other hand, this is the type of case in which an insurer is statutorily required to pay unconditionally to its insured the minimum amount undisputedly due, under threat of penalties and attorney's fee. Indeed, the insurer promptly paid more than $66,000 as soon as the judge suggested a tender of the amount admittedly due. Moreover, respondent stated in a memorandum in support of his motion for summary judgment that the insurer had made a verbal offer to settle the claim at a figure less than the contractor's estimate of $66,335.24 about three months after the fire and before the insured had consulted an attorney. Under these circumstances it is highly unlikely that the client would have agreed to pay (and it would have been unreasonable for the attorney to charge) forty per cent of the total recovery under the $90,000 policy, leaving the client a maximum possible recovery of $54,000 less expenses and costs of litigation. The record therefore fairly establishes an agreed fee in the range of the fee of one-third of the recovery in excess of $51,000 that the client and respondent's partner asserted was their agreement (an assertion respondent admitted he was unable to dispute).[8]
The total amount received in the settlement of the client's fire insurance case was $85,735.24 ($66,335.24 plus $19,400.00). The amount recovered in excess of $51,000 was $34,735.24. Therefore, without consideration of expenses or costs, the client was entitled to receive $51,000 plus two-thirds of $34,735.24, or approximately $74,000, minus the $13,000 fee for the criminal case. The client received $27,000 from the insurer's first payment and $19,400 from the final payment, plus the benefit of the bank's payment of the mortgage which exceeded $16,400. The client thus received more than he was due as his share of the total settlement proceeds, and respondent does not presently owe any amount to the client. However, although the client ultimately suffered no injury, respondent was partially responsible for the delay in paying the client his full share of the insurer's first payment and the delay in satisfying the mortgage.
As to the third specification, the commissioner found that the client was aware an expert was needed and that respondent in fact conferred with the expert numerous times concerning the client's case. The commissioner concluded that although the expert was overpaid, the payment did not affect the funds due to the client who was also overpaid, and there was no violation of DR 1-102(A)(4) or (6).
As noted above, the client eventually received his entire share of the settlement funds, and any overpayment to the expert did not injure the client. The Bar Association did not prove by clear and convincing evidence that respondent engaged in dishonest or deceitful conduct by paying the expert (who was also respondent's client) a fee in excess of the amount earned. At most respondent was highly neglectful in paying the expert in advance and failing to insure that the expert's services were fully and properly performed.
As to the fourth specification, the commissioner found that the client was fully paid by the $2,000 payment on March 11, *160 1985 and that the firm's trust account was not overdrawn to that date. The commissioner therefore concluded that respondent did not violate DR 1-102(A)(4), (5), (6) or 9-102(A) and (B).
The commissioner's findings were based on a forty per cent fee agreement, but we have concluded that the fee agreement was one-third of the recovery in excess of $51,000. The client was entitled to more than $48,000 from the insurer's first payment ($51,000 plus two-thirds of the excess, minus the $13,000 fee for the criminal matter), but was paid only $27,000 from these funds. Further, respondent withdrew $30,000 in fees from the proceeds of the initial draft at a time when it was not certain that any additional funds would be forthcoming. He therefore converted the client's funds to his own use (or to his firm's use), at least for the period of time between the insurer's first payment in late January, 1985 and the final payment by the insurer in May, 1985. This misconduct was in addition to endorsing the initial draft without authorization, failing to timely pay the mortgagee as directed, and failing to render an accounting of the client's funds.
The Rauch Matter
Respondent represented Mrs. Janet Rauch in a claim arising from an automobile accident. He filed suit to recover for property damage, medical expenses and personal injuries suffered by the client in the accident.
Prior to trial respondent negotiated a partial settlement for the collision damage claim in the amount of $6,000 and a sale of the client's damaged Porsche in the amount of $8,500. Respondent endorsed his name on each of the drafts and turned them over to his client without attempting to collect a fee.[9]
After the three-day trial which ended on March 30, 1984, judgment was rendered in favor of respondent's client in the amount of $1,500, plus interest and costs. The insurer subsequently issued a draft in the amount of $1,965.84 payable jointly to respondent and his client. Respondent endorsed his name on the draft and deposited it into his firm's trust account.[10]
The client testified at the commissioner's hearing that she was not informed of the outcome of her suit nor of the receipt of the draft until her telephone call to respondent seven months after the judgment. Respondent told her that the draft had been applied to his fee for handling the case. She insisted that the fee arrangement between her and respondent was an exchange of respondent's legal services for a discount on repairs of respondent's foreign automobiles at the repair shop owned by the client and her husband.
Respondent testified that he informed the client of the judgment and of the fact that the trial judge had not believed her testimony, but did not have any specific recollection of speaking to the client about the draft until the later call by the client. According to respondent, the fee arrangement was for payment of a reasonable fee and the value of his services had far exceeded the amount of the draft. He conceded that he did not provide the client with a written accounting of the funds or with an itemized bill for his services. He further stated that he believed that he had been given a discount on some of his automobile repairs, but pointed out he had performed many legal services without charge for the client and her husband, such as incorporation of their business, advice on tax matters and collection problems, helping the client run the business during her husband's hospitalization, and attaining a temporary reconciliation prior to the couple's divorce.[11]
The Bar Association charged respondent with failure to promptly notify his client of receipt of the funds in satisfaction of the judgment and with neglecting to maintain *161 records or to render an appropriate accounting to the client concerning these funds, in violation of DR 9-102(B)(1) and (3). Respondent was also charged with commingling and converting the client's funds to his own use, in violation of DR 9-102(A), (B)(4) and 1-102(A)(4), (5) and (6).
The commissioner found there was a complete absence of evidence reflecting an appropriate accounting because respondent could not locate complete records or recall notifying the client of the receipt of the funds. Therefore, respondent violated DR 9-102(B)(1) and (3). The commissioner also determined that respondent violated DR 9-102(A), (B)(4) and 1-102(A)(4), (5), and (6) by converting the client's funds to his own use in the mistaken belief that he was entitled to unilaterally determine and pay his fees without accounting to the client or obtaining her permission. The commissioner noted, however, that respondent had performed "a prodigious amount of work" on behalf of the client and her husband at little or no fee and that the reasonable value of his services in the accident case alone would have exceeded the amount paid by the insurer, but that respondent at the time was "functioning under a full-blown alcohol psychosis" which rendered him unable to comply with basic disciplinary rules such as accounting to the client.
The Association proved by clear and convincing evidence that respondent failed to notify his client of the receipt of the judgment proceeds, failed to render an accounting for the funds, and withdrew the entire amount of the funds as his fee without ascertaining that the client agreed this amount had been earned as a fee. Generally, a check representing the proceeds of a judgment belongs in part to the client and in part to the lawyer, and must be deposited in a trust account. DR 9-102(A)(2); Louisiana State Bar Association v. Alker, 530 So.2d 1138 (La.1988). The lawyer must also promptly and unconditionally tender the portion of the proceeds which represents the client's share of the funds. DR 9-102(B)(4). If there is a dispute between the lawyer and the client over the amount of the fee, the lawyer, in addition to unconditionally tendering a reasonable amount in payment of the client's share of the funds, must maintain the disputed portion of the fee in the trust account until the dispute is resolved. DR 9-102(A)(2); Louisiana State Bar Association v. Alker, supra.
Here, respondent deposited the proceeds of the judgment in a trust account, but failed to maintain the funds in the trust account until he determined that there was no dispute over his entitlement to the funds as a fee.
Penalty
In the Hummer matter respondent received a draft in partial payment of the property damage claim in late January, 1985 and endorsed the draft without the authorization of the mortgagee of the damaged property. Neither he nor his firm paid the client his full share of those proceeds or paid the mortgagee as directed by the client, and neither rendered an accounting of the funds. Respondent and his firm also withdrew fees in excess of the amount then earned and converted these funds to their own use until the client was fully paid from the final settlement on May 1, 1985.
Respondent was fully responsible for the unauthorized endorsement. His partial responsibility for the other misconduct is complicated by extenuating factors. This was respondent's first contingency fee case in seventeen years of practice. He represented his partner's client during a period of tension within the partnership, which completely broke up about a month after the insurer's initial payment. The client was in jail about the time of the firm's dissolution and disappeared prior to the commissioner's hearing, where respondent was first represented by counsel. There were probably other fees due from the client for representation in the second criminal charge for which the client was in jail, and respondent refused to endorse the check for the insurer's final payment until there was an accounting for all services, fees and expenses.
Respondent's misconduct cannot be justified, but these unusual circumstances, considered with respondent's alcoholic psychosis at the time (to be discussed in mitigation), *162 suggest more negligence than dishonesty and make the violations less reprehensible.
In the Rauch matter respondent failed to notify his client of the receipt of the judgment proceeds, failed to render an accounting of the funds, and failed to maintain the funds in the trust account until he and his client agreed as to the amount of the fee that had been earned. On the other hand, respondent performed a great deal of services for the client and her husband for little or no fee, and this case has the appearance of an attorney's helping a friend under a loose fee arrangement.
There were no clear aggravating factors, such as prior disciplinary offenses, pattern of misconduct and failure to acknowledge the wrongful nature of the conduct. Standards for Imposing Lawyer Sanctions, § 9.22 (1986). The evidence is somewhat neutral as to who benefitted from the failure to pay Hummer promptly, but respondent clearly benefitted from his failure in the Rauch matter to maintain the funds in trust until the fee issue was settled.
Mitigating factors included respondent's prior unblemished record, his remorse and his cooperation during this proceeding. Standards, supra, § 9.32. The commissioner described a "compulsion to be brutally honest even in situations when silence might have better served his own self interest".
The principal mitigating factor was respondent's disease of alcoholism, for which he sought treatment shortly after the events at issue in this proceeding. Respondent consulted a substance abuse counselor on June 5, 1985. The counselor testified that respondent was unable to carry on a conversation and had severely impaired judgment. The initial diagnosis was a psychosis induced by alcohol. He underwent intensive treatment supervised by a psychiatrist and abstained from alcohol. By the first part of 1987 the counselor opined that the psychosis had ended. The prognosis in late 1987 was very favorable, and respondent had not had a drink since his initial consultation almost three years before the commissioner's report. Moreover, respondent has freely given of himself in helping other attorneys with alcohol problems.
The commissioner, commenting that the violations were of a serious nature and required discipline despite the existence of substantial mitigation, recommended a suspension for a relatively limited period of time. The Bar Association recommended a suspension of eighteen months to two years, noting that a longer suspension would be appropriate except for respondent's continuing rehabilitation from alcoholic addiction.
In Louisiana State Bar Association v. Hinrichs, 486 So.2d 116 (La.1986), this court set forth general guidelines for imposing discipline in cases involving conversion of client's funds. Focus is generally on the attorney's misconduct in terms of state of mind (intentional or negligent to a higher or lesser degree), the presence or absence of fraudulent acts, the magnitude and duration of the client's deprivation, the extent of the client's harm or exposure to harm, the promptness and extent of restitution, and the presence of aggravating or mitigating circumstances.
Here, the conversion in the Hummer case, because of the confusion in the shared responsibility for paying and accounting to the client, involved a lesser degree of negligence. Further, there was a relatively brief period of deprivation and no eventual harm to the client. Unauthorized endorsement of the mortgagee involved a greater degree of culpability, and the bank suffered eventual harm from respondent's failure to pay the mortgagee (although both the client and the respondent's partner arguably had a clear opportunity and responsibility to pay the mortgagee from the proceeds of the final draft about three months later).[12] The conversion in the Rauch matter involved a higher degree of negligence and an extended deprivation of the client's funds, the most serious *163 aspect of which was respondent's failure to maintain the funds in trust until the fee issue was settled by agreement or by a civil action if necessary.[13]
The most difficult consideration involving penalty, as pointed out by the Bar Association, is the weight to be given to respondent's alcoholism during the pertinent period of practice and to his subsequent rehabilitation. While voluntary intoxication is not a defense to charges of professional misconduct, the fact of alcoholism may be an appropriate consideration in determining the mental state of the attorney and the culpability for commission of fraudulent acts. This consideration is particularly appropriate as a factor in mitigation when the attorney has subsequently undertaken to rehabilitate himself and has been continuingly successful in recovering from the disease of alcoholism, especially if the clients did not sustain substantial harm.
Disciplinary proceedings are not primarily to punish the lawyer, but to protect the courts and the public from unprofessional conduct. Louisiana State Bar Association v. Alker, supra. In terms of public protection, a lesser penalty is warranted where there was misconduct largely attributable to the alcoholism of an attorney who has subsequently rehabilitated himself and no longer presents the same danger to his clients. Louisiana State Bar Association v. Klein, 511 So.2d 1137 (La.1987); Louisiana State Bar Association v. Stewart, 500 So.2d 360 (La.1987); Louisiana State Bar Association v. Mundy, 423 So.2d 1126 (La. 1982).
Respondent was indeed guilty of serious misconduct. Nevertheless, this case does not have the flavor of dishonesty usually present in conversion cases, because of the unusual circumstances previously discussed and because of the overriding presence of the disease of alcoholism from which respondent has undergone a successful recovery to date. Under the Hinrichs guidelines and without the consideration of the alcoholism factor, this case would probably fall in the two-year suspension category. Because of respondent's successful rehabilitation to date, his cooperation in this proceeding, his commitment for restitution to the bank, and his previously unblemished record in seventeen years of practice, we conclude that the appropriate penalty is suspension for one year, with readmission contingent upon satisfactory proof of respondent's (1) continuing recovery from substance abuse, (2) escrowing of the sum of $1,965.84, plus interest, until the fee issue in the Rauch matter is settled by agreement or litigation, and (3) making diligent efforts at restitution to the bank in the Hummer matter.
Decree
For these reasons, it is ordered that Geoffrey Longenecker be suspended from the practice of law in Louisiana for one year from the date of finality of this judgment, with reinstatement conditioned upon respondent's providing proof to the Committee on Professional Responsibility of his (1) continuing recovery from substance abuse, (2) escrowing of the sum of $1,965.84, plus interest, until the fee issue in the Rauch matter is settled by agreement or litigation, and (3) making diligent efforts at restitution to the bank in the Hummer matter. Respondent is to bear all costs of this proceeding.

On Application for Rehearing
PER CURIAM.
Respondent has applied for a rehearing, contending that probation is more appropriate in this case than suspension from the practice of law. The rehearing is granted.
The present provisions for disciplinary procedures in Louisiana do not provide for probation.[1] However, probation is *164 recognized as an appropriate sanction under certain circumstances. Standards for Lawyer Sanctions § 2.7 (1986). Probation may be imposed as a sole sanction or along with a sanction of reprimand. Further, probation may be imposed as a condition of readmission following disbarment or a period of suspension.
Probation is appropriate when there is little likelihood that the lawyer will cause harm to the public during the period of rehabilitation and when the conditions of probation can be adequately supervised. Probation may also be appropriate in cases of temporary disability.
In the present case respondent's professional conduct underwent a dramatic downturn after seventeen years of practice. The testimony of a psychologist established that respondent, at the time of the misconduct at issue in these proceedings, was suffering from an alcoholic psychosis which severely impaired his judgment and adversely affected his performance as an attorney. Since June 5, 1985, respondent has been a recovering alcoholic and has not taken a drink. During this time he has actively participated in programs with Alcoholics Anonymous and in counseling fellow lawyers who are having problems with alcohol abuse.
It is highly unlikely that the profession or the public will be endangered by the continuation of respondent's license to practice law under probationary guidelines and supervision.[2] Indeed, conditions of probation not only will insure that respondent will practice according to acceptable standards, but also may provide valuable public service (such as counseling to attorneys undergoing alcohol-related problems). We conclude that while respondent's misconduct warrants sanction, the more appropriate sanction is a period of probation under conditions imposed by this court.
Accordingly, our previous decree, ordering suspension from the bar, is vacated, and it is ordered that respondent be placed on probation for a period of two years; respondent is to report to the clerk of this court for conditions of probation. Different conditions of probation may be imposed by the court at a later date.
Respondent's probation may be revoked upon application to this court, and a period of suspension may be reimposed. In the event that the period of probation is completed successfully, respondent may apply to this court for termination of probation.
NOTES
[*] Editors Note: This opinion was originally published at 532 So.2d 1143. It is published here with the opinion on application for rehearing.
[1] The Code of Professional Responsibility was replaced by the Rules of Professional Conduct, effective January 1, 1987. The alleged violations in this case occurred before the effective date.
[2] The portion of the claim pertaining to the contents of the home had been settled earlier. The client consulted respondent's firm as to a dispute over the property damage claim only.
[3] By the time of the second check to the client, respondent's firm had been dissolved, but the two partners continued to share office space and to attempt to wind up the firm's affairs. The balance in the trust account gradually diminished and was less than $100 on April 9, 1985.
[4] A check in the amount of $4,822.59 was issued by respondent's partner out of the trust account for payment of a personal debt. Respondent's partner alleges that respondent gave him authority to issue this check as part of the legal fees in the client's case. Respondent disputes this allegation.
[5] Responsibility for this debt to the bank is one of the issues in ongoing civil litigation between respondent and his former partner pertaining to the dissolution of the firm.
[6] Respondent, at the investigatory hearing in the disciplinary proceeding against his partner, admitted that he and his partner had each made disbursements pertaining to this client's case and that each had the responsibility for proper payment of the client and the mortgagee.
[7] The client testified at the investigatory hearing that the agreed fee was one-third of the recovery in excess of the $51,000 already offered the insurer. (Between the investigatory hearing and the commissioner's hearing, the client disappeared while facing drug charges in another parish.) Respondent's partner verified the client's testimony as to the fee and stated that there was no written fee contract. However, upon being confronted with a written contract calling for a flat forty per cent fee, the partner testified that respondent requested this contract to bolster the evidence in the event the judge decided to award attorney's fees for arbitrariness in the litigation against the insurer. Respondent denied any knowledge of the fee arrangements or of the $51,000 offer or of the written contract. However, in a separate disciplinary proceeding against respondent's partner, respondent testified that he understood from his partner the fee was one-third of the recovery over $51,000.
[8] Respondent in his testimony stated his dissatisfaction with the fee charged to this client pertained to the criminal case, which had required a great deal of time expended by associates.
[9] Respondent testified that he told the client that they would settle the fee at the conclusion of the litigation.
[10] There was a substantial dispute whether the client endorsed the draft.
[11] Respondent represented the client's husband in the divorce until the client raised the issue of a possible conflict of interest.
[12] Respondent has voluntarily withdrawn from the protection of Chapter 11 bankruptcy and has committed himself to make restitution to the bank, with or without contribution from his former partner with whom he is engaged in litigation over the partnership affairs.
[13] This failure can be corrected belatedly by this court's order to deposit the amount of these funds, plus interest, in trust until the fee dispute is resolved.
[1] In its evaluation of the lawyer disciplinary system in Louisiana, the American Bar Association's Standing Committee on Professional Discipline recommended the implementation of probation as a sanction. The committee pointed out that the absence of probation as an available sanction for lawyers who might otherwise perform useful services, but who need some form of supervision, requires a choice between suspension, which involves an unnecessary deprivation of the lawyer's livelihood, or continuation of practice, which involves a possible threat to the public.

The committee's evaluation is currently under study by a task force appointed by this court.
[2] Adequate supervision is always a problem when probation is imposed. Respondent's counsel has suggested that attorneys who are recovering alcoholics would make excellent volunteer probation officers. The solution utilized in this case is an interim method for supervising probation, pending receipt of the task force's report to this court.