481 So.2d 574 (1986)
LOUISIANA STATE BAR ASSOCIATION
v.
James D. McGOVERN.
No. 84-B-2098.
Supreme Court of Louisiana.
January 13, 1986.
*575 Thomas O. Collins, Jr., Wood Brown, III, New Orleans, Carrick R. Inabnett, Monroe, Roland J. Achee, Shreveport, Robert J. Boudreau, Lake Charles, Frank J. Gremillion, Baton Rouge, Harvey Lewis, New Orleans, Alfred S. Landry, New Iberia, Philippi P. St. Pee, Metairie, Gerard F. Thomas, Jr., Natchitoches, for applicant.
George M. Papale, Stumpf, Dugas, LeBlanc, Papale & Ripp, Gretna, James D. McGovern, New Orleans, for James D. McGovern.
Vance E. Ellefson, New Orleans, for Louisiana State Bar Association.
DENNIS, Justice.
Petitioner, the Louisiana State Bar Association, through its Committee on Professional Responsibility, seeks the disbarment of respondent, James D. McGovern. The charges against McGovern consist of specifications of alleged misconduct involving three separate legal matters.

*576 1. Notice of Charges
At the outset, we are faced with a problem of procedural due process. In addition to the charges made against the respondent in the bar association's suit for disbarment, the commissioner, after taking evidence, recommended the finding of additional violations not alleged in the bar association's petition. The association later filed a further pleading praying that all of the commissioner's recommendations be adopted by this court. The question raised is whether it would be a denial of due process of law for this court to find a lawyer guilty of charges based on evidence adduced at an evidentiary hearing if he was not given notice of the charges prior to the hearing.
This court has exclusive original jurisdiction of disciplinary proceedings against a member of the bar. La. Const. of 1974, Art. 5, Sec. 5(B). The rules of this court provide for the creation of the bar association, the code of professional conduct, and the procedure in disbarment suits. Rules of Supreme Court of Louisiana, Rule 19 (1973); La.R.S. 37:211, LSBA v. Edwins, 329 So.2d 437 (1976); In re Mundy, 202 La. 41, 11 So.2d 398 (La.1942); Hood, Renewed Emphasis on Professional Responsibility, 35 La.L.Rev. 719 (1975). Under these rules, when the bar association's Committee on Professional Responsibility is of the opinion that a lawyer is guilty of a violation of law or rule of professional conduct of sufficient gravity to show moral unfitness to practice law, it must institute a suit for disbarment or suspension by a petition which shall be served upon the respondent. Louisiana State Bar Association Articles of Incorporation, art. 15, § 6(a). When issue is joined or when the respondent has not appeared to plead or answer within the time allowed, this court may hear the evidence, or we may appoint a commissioner to take the evidence. Id., section 6(b). Regardless of how the evidence is taken, this court must decide, based on the record in the case, both whether the attorney is guilty of the unethical conduct charged, as well as what penalty is appropriate if disciplinary sanctions are warranted. LSBA v. Edwins, supra; LSBA v. Wheller, 243 La. 618, 145 So.2d 774 (1962). In re Reed, 207 La. 1011, 22 So.2d 552 (1945).
In the present case, the bar association's disbarment suit essentially charged respondent McGovern with neglect of legal matters entrusted to him and failure to refund unearned fees. A commissioner was appointed who, upon completion of the taking of the evidence, recommended that McGovern be found guilty of the original charges and several other breaches of ethical conduct as well, viz., inserting in a will a provision appointing himself as attorney for the succession without the testator's consent (DR 2-103(A)); knowingly accepting employment constituting a conflict of interest (DR 5-101(A)); accepting employment involving multiple representation and failing to disclose the resulting conflict of interest (DR 5-105(A), (B) & (C)). Because McGovern was not given fair notice of the additional violations recommended by the commissioner before evidence was taken on them, we conclude that any deprivation of the attorney's right to continue practicing law based on the uncharged violations would deny him due process of law.
Disbarment, designed to protect the public, is a punishment or penalty imposed on the lawyer. Ex parte Garland, 4 Wall. (71 U.S.) 333, 380, 18 L.Ed. 366, 370 (1867); Spevack v. Klein, 385 U.S. 511, 515, 87 S.Ct. 625, 628, 17 L.Ed.2d 574, 577 (1967). Thus, he is accordingly entitled to procedural due process, which includes fair notice of the charge. In re Ruffalo, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968). See In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682, 694 (1948). As stated in Randall v. Brigham, 7 Wall. (74 U.S.) 523, 540, 19 L.Ed. 285, 293 (1869), in proceedings for disbarment which are "not taken for matters occurring in open court, in the presence of judges, notice should be given to the attorney of the charges made and an opportunity afforded him for explanation and defense."
In re Ruffalo, supra involved a situation in which a lawyer had been disbarred based *577 on a charge which was not filed until after he and his witness had testified without notice of the charge. The Supreme Court held that, because disbarment suits are adversary proceedings of a quasi-criminal nature, the defendant must know the charge before the proceedings commence; fair notice as to the reach of the disciplinary procedure and the precise nature of the charges are required by procedural due process. In reversing the disbarment decree, the high court observed:
"`Such procedural violations of due process would never pass muster in any normal civil or criminal litigation.'"
"... [The proceedings] become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused. He can then be given no opportunity to expunge the earlier statements and start afresh." In re Ruffalo, 390 U.S. 544, 551; 88 S.Ct. 1222, 1226.
Likewise, McGovern had no notice that his acts or omissions in the uncharged violations would be considered disbarment offenses until after he had testified at length on all of the material facts pertaining to them and the commissioner had filed his findings based on that testimony. How the charges would have been met had they been originally included in those leveled against respondent by the bar association no one knows. Accordingly, in order to protect the respondent from an unconstitutional deprivation of due process, the violations recommended by the commissioner which were added to the initial charges of the bar association's petition will not be considered by this court.

2. The Commitment Matter
In connection with the commitment matter, the bar association notified respondent of the charges as follows:
In July of 1981, you were retained by Mrs. Ernesia D. Stuart, to perform legal work involving the judicial commitment of her son. You were paid a fee of $400.00 and received all necessary documents from Mrs. Stuart. Despite payment of said fee and repeated requests from your client, you performed little or no work for the fee paid and refused to return said fee or the documents brought to you by Mrs. Stuart. You, further, failed to communicate with your client; all in violation of Disciplinary Rule 1-102 and 6-101(A)(3) of the Canons of Professional Responsibility for the Louisiana State Bar Association.
In disciplinary proceedings, the bar association has the burden of (1) pleading the lawyer's violation of a disciplinary rule, (2) producing evidence of that violation, and (3) persuading this court as the trier of fact of existence of the violation by clear and convincing evidence. La.Const. 1974, Art. 5, Section 5(B); Louisiana State Bar Association Articles of Incorporation, Art. 5 § 16; LSBA v. Edwins, 329 So.2d 437 (La.1976); LSBA v. Brown, 291 So.2d 385 (La.1974). See also LSBA v. Levy, 292 So.2d 492 (La. 1974); LSBA v. Brown, 291 So.2d 385 (La. 1974); In re Novo, 200 La. 833, 9 So.2d 201 (1942); Annotation, Attorneys' MisconductDegree of Proof, 105 A.L.R. 984 (1936); and McCormick on Evidence, Section 337 (2d ed. 1972).
From the evidence of record we find clear and convincing proof of the following: On July 1, 1981, Mrs. Ernesia D. Stuart retained McGovern to assist in returning her adult son to the Veteran's Administration Hospital in Gulfport from which he had departed without permission. The son had a long history of mental illness and violence. Mrs. Stuart had been informed by the hospital that her son could not be readmitted without a judicial commitment. McGovern requested and received $400 in advance as a retainer. He gave Mrs. Stuart a receipt marked "Retainer only, on legal problems, James E. Stuart, Jr., re VA commitment, etc." During much of the next three months McGovern was ill with diabetes and absent from his office. He did not file any commitment pleadings or write any letters to the Veteran's Administration. In September, 1981, her son became so sick that Mrs. Stuart called the police who took him to the New Orleans *578 VA hospital. Two weeks later the son was readmitted by the Gulfport VA hospital. McGovern has not returned any part of the $400 fee.
McGovern testified that the $400 advance fee was intended as a retainer in connection with an attempt to have Mrs. Stuart's son readmitted to the hospital without an expensive judicial commitment. He testified that the day after he was retained he engaged a social worker at the Gulfport VA hospital in a 38 minute phone conversation, during which the worker ultimately agreed that the hospital would readmit Mrs. Stuart's son if he returned voluntarily. Immediately thereafter, McGovern said he received a call from his client and reported to her the results of his discussion with the social worker.
McGovern introduced handwritten notes as evidence that he researched commitment procedures on August 3, 1981. Subsequently, he stated, he checked the records at the Civil District Court to determine whether Mrs. Stuart was still authorized to serve as curatrix for her son. During this period, McGovern contended, his contacts with his client were hampered by his illness and her instructions not to call her at home because she was fearful of alerting her son to the plans to recommit him. Nevertheless, McGovern testified he saw Mrs. Stuart on at least two occasions after her initial visit and had several telephone conversations with her. McGovern also claims that at some point he furnished his client with a copy of a June 1, 1981 New Yorker article on problems encountered by families of institutionalized mental patients.
McGovern testified that he ceased work on the matter when Mrs. Stuart visited his office on September 18, 1981 and left a message that her son had been readmitted to the hospital. He conceded that he was incapacitated for substantial periods but stated that he took no steps to have another attorney assist him with Mrs. Stuart's case because the problem was simple if the son could be returned to the hospital without a judicial commitment. McGovern also admitted that he did not return his client's curatrix papers promptly but testified that he restored them after receiving a letter from the bar association.
Mrs. Stuart, on the other hand, testified that McGovern took her money and did nothing. She claimed that she could not get him on the phone or find him at his office during the time she was trying to reinstitutionalize her son. Furthermore, she stated she had tried unsuccessfully to catch him at his office over twenty times during the two year period preceding the hearing. Unfortunately, although McGovern had been given notice, neither McGovern nor his lawyer attended the hearing at which Mrs. Stuart testified. Consequently, she was not cross-examined by McGovern or his attorney on crucial points to which McGovern testified, e.g., that she employed McGovern to assist with a voluntary rather than a judicial commitment, that he informed her of the possibility that the Gulfport VA hospital would readmit her son if he returned voluntarily, that he had done library and courthouse research and supplied her with a New Yorker article, and that he had communicated with her in the office and on the phone on several occasions.
The evidence is not clear and convincing that McGovern was employed to obtain a judicial commitment. Mrs. Stuart was not questioned as to the exact nature of the legal services she expected McGovern to perform. Without her rebuttal of McGovern's testimony that he was employed only to assist with a voluntary readmission, we cannot say that the bar association's version is highly probable. Furthermore, we are unable to say that he neglected his employment. He may have performed a valuable service toward the son's ultimate readmission in his telephone call to the Gulfport VA hospital. The bar association does not suggest what else McGovern should have done regarding a voluntary commitment. On the other hand, except for the phone call and the initial interview, none of the other work described by McGovern appears to be related to facilitating the son's voluntary readmission. *579 McGovern only vaguely described his efforts on behalf of Mrs. Stuart and he failed to testify as to the immediate purpose of his legal research. Although the research described might have been compatible with plans for a judicial commitment, McGovern insisted that his employment and his retainer were solely for the purpose of a voluntary readmission. Consequently, we conclude that McGovern did not earn more than one-half of the $400 retainer and should have refunded the balance when his client informed him that she no longer required his services. McGovern was also derelict in his failure to return his client's documents promptly. He has now done so, however, and she does not appear to have been prejudiced by his tardiness.

3. The Criminal Matter
In connection with his handling of a criminal case, the Bar Association notified respondent that he was charged as follows:
In 1982, you were retained by Mr. Benjamin Villavasso in certain criminal matters and were paid a fee in the sum of $750.00. Despite payment of said fee and continual requests from your client, you failed, refused and neglected to take any action to represent the interest of your client; failed to appear at necessary hearings, causing your client to enter a plea of guilty since he was unrepresented, costing him to pay additional sums. Additionally, you failed, to communicate with your client and refused to return said fee paid by your client; all in violation of Disciplinary Rule 1-102 and 6-101(A)(3) of the Canons of Professional Responsibility for the Louisiana State Bar Association.
On June 23, 1982 McGovern was employed by Benjamin Villavasso for a $750 advance retainer to defend him against a possible obscenity charge. The lawyer and his client had an understanding that the fee would pay for legal services through the trial if charges were filed and prosecuted. Shortly after being employed, McGovern discussed the case with his client for about one hour. He also discussed the matter briefly with the assistant district attorney in charge of screening, learned that charges would be filed, and appeared with his client at arraignment on July 19, 1982, when his client pleaded not guilty. The trial judge set a date for hearings on preliminary motions on August 6 and set the case for trial on August 16. However, McGovern failed to accompany Villavasso when he appeared in court on August 6. The court scheduled a pretrial conference for August 9, issued an instanter subpoena for Villavasso to appear on that date, and reset the hearings on preliminary motions for the same day. Villavasso attempted in vain to inform McGovern of this turn of events by mail, phone, and in person. Finally, he slipped his subpoena under the door of McGovern's residence. McGovern failed to appear for court on August 9, even though Villavasso sent several messages to his office. After discussions with assistant district attorneys, Villavasso became concerned about his loss of time from work, decided to plea bargain, enlisted the services of a legal aid attorney, entered a plea of guilty to an unexpungable obscenity conviction, and was fined $250 plus costs. Although McGovern discovered the subpoena under his door sometime shortly after his client's August 9 court appointment, he did not try to communicate with him. On the morning of the trial date, August 16, because he was still incapacitated with diabetes, McGovern phoned the judge's office to request a continuance. He was informed that his client had pleaded guilty one week earlier. Despite repeated requests from Villavasso, McGovern has not refunded any of the $750 advance fee.
McGovern's explanations of his failures to appear were somewhat involved: McGovern had informed his client that he might use his diabetic incapacity as a reason for requesting a continuance of the trial. McGovern was not obliged to be present on the date set for hearings on technical pleadings unless he planned to file such pleadings. Although he had prepared some pleadings, he was too sick to go to court on August 6 and decided it would *580 be better not to file them anyway. Although he was aware that the assistant district attorneys used preliminary court dates as occasions to bring pressure to bear for guilty pleas, he did not think it was necessary to communicate with his client between court appearances. He knew that his client had been involved in criminal court proceedings before and expected that the court routinely would send him home with instructions to reappear on the trial date. He testified that the court's action in ordering Villavasso to come back for a pretrial conference, without notifying his attorney, was irregular and unexpected. Villavasso's guilty plea surprised and dismayed McGovern because he thought a trial would have resulted in acquittal.
Clear and convincing evidence exists that McGovern neglected a legal matter entrusted to him. (DR 6-101(A)(3)). McGovern negligently allowed his client to face court appearances and prosecutorial pressures alone without specifically preparing him for his attorney's absence. The attorney neglected to communicate with his client, to call his office for messages, or even to respond to callers or messages at his residence. Under these circumstances, he should have realized that he could not effectively defend his client against an unfolding criminal prosecution and should have withdrawn. We find there is clear and convincing evidence that McGovern, by his failure to refund any of the retainer, has charged a clearly excessive fee. (DR 2-106(B)). For the $750 fee, the attorney did little more than conduct an initial client interview, discuss the case with an assistant district attorney, and appear at arraignment. This amount clearly exceeds a reasonable fee in light of the appropriate factors to be considered. (DR 2-106(B)). Because McGovern caused inconvenience, risk and possibly serious damage to his client, we conclude that he did not earn any part of the fee charged.

4. The Succession Matter
In connection with the succession matter the bar association notified respondent as follows:
You were retained by Mrs. Willie Mae Ford Johnson to represent the succession of Harrison Webb. Mrs. Johnson gave you all necessary papers, including a will, and, despite repeated requests, you have taken no action to further said succession. Despite your dismissal as attorney by Mrs. Johnson, and her repeated requests, you have failed, refused and neglected said succession and have refused to communicate with Mrs. Johnson as her new attorney and have refused to return necessary documents, including the will; all in violation of Disciplinary Rule 1-102, 2-110(A)(2) and 6-101(A)(3) of the Canons of Professional Responsibility for the Louisiana State Bar Association.
On March 16, 1979 Harrison Webb executed his last will and testament in olographic form. He wrote the will in his hospital room by following a pattern drafted by McGovern. Mrs. Willie Mae Ford Johnson, who had been living with Webb, asked McGovern to draft the pattern will and delivered it to Webb's sickbed. In the will, Webb, in accordance with the pattern, bequeathed the disposable portion of his estate to Mrs. Johnson and designated McGovern as the attorney for his succession. After Webb executed his olographic will, Mrs. Johnson gave it to McGovern for safekeeping. Mrs. Johnson paid McGovern $25 for drafting the pattern will.
Harrison Webb died two weeks after executing his olographic will. Two or three weeks after his death an attorney for five of his children opened his succession and petitioned for the appointment of an administratrix. On May 15 and June 5, 1979 an attorney for one of Webb's daughters wrote McGovern asking for a copy of the will and any pleadings he may have filed. On June 6, 1979 McGovern mailed copies of the olographic will and Webb's divorce judgments to all of the heirs and to Mrs. Johnson with his offer to cooperate. After this, McGovern admittedly permitted the matter to lie dormant.
*581 McGovern testified to multiple reasons for not preparing and filing a petition to probate the will: Webb's children resented Mrs. Johnson's legacy and refused to serve as witnesses to the authenticity of their father's handwriting in the will. Several of the heirs intended to attack the will for lack of testamentary capacity. An illegitimate child planned to assert a claim. Passage of time might work toward amicable settlement. Meanwhile, Mrs. Johnson, whom he considered to be his primary client, continued to have the possession and enjoyment of Webb's house and truck.
Mrs. Johnson apparently was not satisfied, however, for on March 2, 1983 she informed McGovern by mail that she had hired another lawyer and requested that he turn over all important papers regarding the succession. When McGovern did not respond, the new attorney wrote to McGovern and complained to the bar association on May 13, 1983. That attorney testified that McGovern called him and expressed willingness to turn over the file but pleaded lack of time to comply immediately. McGovern testified that he did not turn over the papers because, as the attorney named in the will, he was entitled to a fee and to custody of the succession property.
Ultimately, because of these and other complaints, and McGovern's continued lack of response, a formal investigatory hearing was held by the Committee on Professional Responsibility on November 18, 1983. McGovern telephoned the bar association office on the morning of the hearing and stated that he was too ill to attend. Maurice Indest, an attorney with whom McGovern shared office space testified that respondent had been incapacitated with diabetes and unable to visit his office more than once or twice a month for two years.
Shortly after the November 18, 1983 investigatory hearing, McGovern associated Indest for the purpose of completing the Webb succession matter. Indest turned over to the administratrix all papers belonging to the succession. On January 31, 1984 Indest filed a petition to probate the olographic will. He succeeded in having the will probated on February 7, 1984. Mrs. Johnson and her sister acted as handwriting witnesses by agreement between Indest and Mrs. Johnson's attorney. At the commissioner's hearing on May 8, 1985 Indest testified that a hearing had been held on one heir's petition to annul the will and that the court had taken the matter under advisement indicating an inclination to uphold the will but urging compromise negotiations.
We are persuaded by clear and convincing evidence that McGovern neglected his assignment as attorney for the succession by his failure to proceed with the probate of the will and his refusal to turn over succession property to the succession representative. As the attorney designated to represent the deceased's estate, McGovern had a duty to enforce the valid provisions of the will as the intention of the testator. Accordingly, he should have presented the will to the court and petitioned for probate and execution. La.C. C.P. arts. 2851-2852. Even if he had doubts concerning the validity of the testament, he was obliged to present it to the court with his petition praying that the document be filed in the record of the succession proceeding. La.C.C.P. art. 2853. Even though McGovern had been designated as the attorney for the estate, he was not at liberty to withhold succession property and documents from the succession representative. A succession representative is deemed by law to have possession of all property of the succession, La.C.C.P. art. 3211, and has the duty of collecting, preserving, and managing the property of the succession in accordance with law. La. C.C.P. 3191, 3221. Among his many other duties, the succession representative is obliged to close the succession as soon as advisable. La.C.C.P. art. 3197. As the attorney designated to represent the succession, it was McGovern's duty to assist in carrying out the legitimate objectives of the testator and the succession representative, not to thwart or delay them.
*582 For almost four years McGovern delayed the probate of the will and collection of succession property by the administratrix. The mere existence of adverse claims did not justify a delay of this length. Although the record fails to detail any damage sustained by the succession, it is clear that substantial delay and inconvenience were caused by McGovern's neglect.

5. Sanctions
The purpose of lawyer disciplinary proceedings is to maintain appropriate standards of professional conduct in order to protect the public and the administration of justice from lawyers who have demonstrated an inability or unwillingness to properly discharge their professional duties. LSBA v. Powell, 439 So.2d 415 (La.1983); LSBA v. Karst, 428 So.2d 406 (La.1983); LSBA v. O'Halloran, 412 So.2d 523 (La.1982); LSBA v. Bensabat, 378 So.2d 380 (La.1979). The discipline imposed in a particular case depends upon the seriousness and circumstances of the offense, fashioned in light of the purpose of lawyer discipline, taking into account aggravating and mitigating circumstances. LSBA v. Powell, supra; LSBA v. Karst, supra; LSBA v. O'Halloran, supra; LSBA v. Bensabat, supra.
In essence, we conclude that McGovern committed several violations of the Code of Professional Conduct. He charged an excessive fee to Mrs. Stuart and failed to promptly return her documents. He neglected the criminal defense of Mr. Villavasso and failed to return the unearned fee he charged. He neglected the probate of Mr. Webb's will and refused to turn over estate documents to the succession representative. A delay of almost four years in closing the succession and placing the beneficiaries in possession is presumptively injurious although not specifically proven in the record. Villavasso may have been damaged by McGovern's failures since both McGovern and his client thought there was a good chance to defend him against the charge. Although no damage to Mrs. Stuart resulted from McGovern's handling of her matter, his conduct with respect to this and the other matters was detrimental to the image of justice under the legal system.
In fashioning the sanctions to be imposed, we take into consideration the following mitigating circumstances. First, McGovern was not guilty of criminal actions, dishonesty, or bad character in connection with his disciplinary rule violations. Second, before these violations, which occurred after the onset of McGovern's diabetes, he enjoyed an excellent reputation with no previous disciplinary complaint against him. Third, McGovern's diabetes should be considered as a qualified mitigating circumstance. The disease was clearly the primary cause of the attorney's neglect of the matters entrusted to him. Yet, he should have recognized his inability to handle these matters properly and should have enlisted the aid of another attorney sooner. Nevertheless, McGovern ultimately turned the succession matter over to a healthy, competent attorney. Finally, McGovern testified that he is now semi-retired and will not undertake such matters again without the assistance of another attorney.
McGovern has demonstrated an inability, due to poor health, to properly discharge his professional duty with respect to matters which require sustained attention and diligence. His failings in these three matters indicate a general pattern of a lack of attention to his legal practice, due to illness, over a prolonged period from 1979 to 1983. His negligence, exacerbated by diabetes and not a moral failing, was of a serious nature, although it resulted mostly in inconvenience rather than demonstrable harm to clients. Because the practice of law is a way of life to which any attorney has devoted years of preparation and on which he and his family have come to rely, because McGovern served his profession with honor and integrity for almost 40 years before becoming incapacitated, because we believe McGovern will keep his word under oath not to undertake serious legal matters alone while incapacitated by diabetes, and because of the other mitigating circumstances, we are not willing to *583 disbar him as the association recommends. Instead, we impose a suspension of one year, at the end of which McGovern may petition to be restored to the practice of law, upon showing satisfactory proof that he has refunded the fees as set forth herein. Additionally, we admonish respondent that his repetition of the type of disciplinary violations we have found in this case probably will lead to his disbarment.

DECREE
Respondent is suspended from the practice of law for one year with readmission conditioned on a refund to Mr. Villavasso of $750 and a refund to Mrs. Stuart of $200.
ATTORNEY SUSPENDED FOR ONE YEAR.