[1] This attorney disciplinary proceeding calls upon us to set forth precepts for determining whether a lawyer who has committed serious ethical violations should be placed on probation and allowed to continue to practice because his infractions were related to alcoholism, and to provide guidelines for establishing the terms and conditions of this type of probation. The respondent attorney, Arthur Dumaine, was convicted of illegal use of a weapon, La.R.S. 14:94, given a suspended sentence of one year in jail, and placed on supervised probation conditioned upon alcohol abuse treatment, community service, fines and costs. The respondent, for purposes of this proceeding, admits the allegations of the bar association's petition that he has been convicted of illegal discharge of a weapon and that this offense is a felony and a disciplinary rule violation.
[2] As a sanction, the disciplinary committee and the respondent recommend that this court simply impose additional conditions to the sanction he received in a prior disciplinary proceeding. In Louisiana State Bar Ass'n. v. Dumaine,538 So.2d 270 (La. 1989), respondent was suspended from the practice of law for eighteen months for having neglected legal matters and mishandled a client's funds; the suspension period will elapse on September 23, 1990. The parties propose that this court decree in the present case that Dumaine may not be reinstated at that time unless he shows that he has completed alcohol abuse treatment, regularly attended Alcoholics Anonymous, maintained sobriety, and demonstrated a propensity toward continuing recovery.
[3] Finding that the respondent committed a felony under circumstances and against a background of prior ethical violations calling into question his moral fitness to practice law, we conclude that he should be suspended preliminarily and until further orders of this court. For lack of an adequate record upon which to base a permanent or final sanction, the case must be remanded to the disciplinary committee for the taking of additional evidence, after which the Committee is ordered to file a new petition proposing a disciplinary sanction based on a more complete record. The factors to be considered in determining whether and upon what conditions this court should ameliorate the discipline of a lawyer whose ethical violations allegedly were the product of a chemical dependency that has been brought under control are set forth in some detail in this opinion. In making such a determination, the primary issues we must consider are whether the attorney's lapses stemmed mainly from chemical dependency rather than lack of moral fitness and whether his recovery has progressed to the extent that he may be permitted to practice without undue risk of harm to his clients, the legal profession or the courts. Because the record does not contain sufficient evidence for a determination that respondent's serious ethical violations resulted from a chemical dependency or that the sanction proposed by the parties will adequately protect the public and other interests, additional evidence must be gathered concerning respondent's moral fitness and alleged alcoholism, after which alternative sanctions should be considered, including disbarment, suspension, probation, reprimand, or a combination thereof.
[4] I.
[5] Dumaine was convicted after a bench trial in the Criminal District Court for Orleans Parish of illegal use of a weapon, La.R.S. 14:94, and sentenced to one year at hard labor. The Court of Appeal affirmed his conviction and sentence. State v.Dumaine, 534 So.2d 32 (La.App. 4th Cir. 1988). In its opinion the Court of Appeal ably summarized the facts that reasonably may *West Page 1199 
be inferred from the record in support of the trial court's judgment:
[6] On Sunday, May 3, 1987, two of defendant's friends and their children went to defendant's house to swim in his pool. Defendant drank beer throughout the afternoon.
[7] At about 5:30 p.m., Troy Williams, a black male, knocked on defendant's door to have defendant notarize a document for him. Williams had never met defendant before but was referred to him by an acquaintance. When the defendant opened the door, he appeared to be intoxicated. Upon seeing Williams, Dumaine kissed him as if he knew him, Dumaine then asked Williams to help him put a cover over his car. Williams did so and the two men entered defendant's house. Once inside, the defendant began to talk about blacks, crime and Vietnam. He asked Williams if he had any brothers or sisters who were criminals. He then told Williams that he had something to stop crime. He reached behind a bookshelf and pulled out a revolver. He then went into his front yard with Williams and, without looking for oncoming traffic, he fired the gun across old Hammond Highway into a vacant lot. Although there were no people or cars in the vacant lot, there were people in the vicinity where the shots were fired.
[8] Following the incident, Williams called the police and thirty to thirty five officers responded, including a SWAT team. Defendant refused to leave his house for approximately one to one and one-half hours. Finally, police apprehended the defendant. A search of the house did not reveal a gun. 534 So.2d at 33-34.
[9] Dumaine applied to this court for certiorari. This court summarily issued a writ, affirmed the conviction, set aside the sentence of one year at hard labor as excessive, and remanded the case for resentencing without incarceration. State v.Dumaine, 541 So.2d 880 (La. 1989).
[10] On remand, the criminal district court sentenced Dumaine to serve one year in parish prison, with credit for time served, but suspended the sentence and placed him on supervised probation for five years subject to certain conditions including completion of a substance abuse treatment program, performance of 100 hours of community service work, and payment of fines and costs. This result, of course, differed from the trial court's original sentence of one year at hard labor. Although the trial court in finding Dumaine guilty of the crime indicated its feeling that the lawyer had a substance abuse problem and ordered a presentence investigation, the record before us does not contain the presentence report or any other statement of the trial court's reasons for imposing either sentence.
[11] In a prior disciplinary proceeding against Dumaine,Louisiana State Bar Ass'n v. Dumaine, 538 So.2d 270 (La. 1989), this court found that in May, 1985 he requested and obtained a $500 retainer from his client and agreed to file suit to have her sister declared incompetent, or to contest her sister's will in the event she died testate. In July of 1985, two months after accepting employment, he determined to his satisfaction that the sister had executed a will while she was apparently lucid and competent, making the prospect of attacking the will unpromising. Despite this conclusion, he concealed his opinion that the client's cause was hopeless, and instead falsely informed her that he had filed suit on her behalf even though he had not done so even after the sister's death three months later. In addition, he failed to place the retainer in a client's trust account or to expend it on her behalf and therefore presumably converted it to his own use. Despite the institution of disciplinary proceedings against him in that matter, he failed to return the $500 retainer during the two years of disciplinary investigations and hearings, and he did not begin to make restitution until November, 1988, one month before oral arguments in this court in that case. During the investigation and hearings, he did not testify candidly or consistently before this court's commissioner. Dumaine's disciplinary record before that proceeding consisted of four reprimands for disciplinary violations, two private and two public, constituting a pattern *West Page 1200 
of neglect causing injury or potential injury to his clients. After considering all of the evidence, this court found that Dumaine had violated the disciplinary rules by neglecting his client's legal matters and mishandling his client's funds and suspended him from the practice of law for eighteen months. Id.
[12] The current disciplinary proceeding was initiated following Dumaine's criminal conviction of illegal use of a weapon that occurred May 3, 1987. The parties elected to proceed without appointment of a commissioner and they waived oral argument, following the abbreviated procedure we approved in LouisianaState Bar Ass'n v. Marinello, 523 So.2d 838 (La. 1988). The record in this case consists solely of the transcript of a short hearing before the disciplinary committee. The Committee took no testimony at this hearing. Instead, the parties merely introduced the record of Dumaine's criminal proceeding. This record contains only the evidence supporting his conviction and does not include any information about his character or alleged chemical dependency. Based on this record, the Committee recommends no additional suspension. Instead, it recommends sanctions designed, in its words, to resolve the "underlying problem" in the case. Specifically, the Committee asks us to condition Dumaine's reinstatement to the practice of law upon his showing, by clear and convincing evidence, that he has completed an inpatient substance abuse program, regularly attended Alcoholics Anonymous meetings at least twice a week, remained sober, made substantial progress in his recovery, and that his prognosis is good and the likelihood of relapse slight.
[13] II.
[14] This court has both the exclusive original jurisdiction and inherent judicial power to decide upon the sanction to be imposed in a disciplinary proceeding against a member of the bar. La. Const. art. II, art. V §§ 1, 5(B); Louisiana State BarAss'n v. McGovern, 481 So.2d 574 (La. 1986); LouisianaState Bar Ass'n v. Edwins, 329 So.2d 437 (La. 1976). These provisions give us not only the power, but also the duty, to adequately assess each case of attorney misconduct. LouisianaState Bar Ass'n v. McGovern, supra; Louisiana State Bar Ass'n v.Edwins, supra; see also Singer Hutner Levine Seeman Stuart v. Louisiana State Bar Ass'n, 378 So.2d 423 (La. 1979). The primary purpose of a disciplinary proceeding is to evaluate the character of an attorney, in light of his conduct and background, to determine if he is morally fit to continue in the practice of law. If he is not, it is our duty to remove him from practice, through either suspension or disbarment, to protect the public and to deter both the errant lawyer and others from similar misconduct in the future. Louisiana State BarAss'n v. Hinrichs, 486 So.2d 116, 119 (La. 1986). Because the goals of disciplinary sanctions are distinct from the aims of criminal corrections, this court, in disciplining a lawyer, will give careful consideration to the sentence imposed in a related criminal case, but it must exercise its independent judgment in shaping sanctions to carry out the disciplinary goals.
[15] The recommendation of the Committee that respondent be reinstated to active practice at the end of his current suspension upon compliance with the stated conditions evidently is based on facts of which there is no proof in the record. The Committee apparently assumed that Dumaine suffers from a chemical dependency that produced his misconduct in this and the prior disciplinary case. There is, however, little evidence to support this conclusion. The record in the criminal proceeding indicates that Dumaine was intoxicated at the time of the offense, and the sentencing judge expressed the opinion that Dumaine had a substance abuse problem, but after receiving a presentence report he sentenced Dumaine to one year at hard labor. After this court set aside that sentence and ruled out incarceration entirely, the trial court gave him a suspended sentence and placed him on probation with conditions of alcohol abuse treatment and rehabilitation. Because we do not have the presentence report, we do not know whether it contains *West Page 1201 
evidence of chemical dependency that influenced the sentencing judge in shaping the probation conditions. In his prior disciplinary case, Dumaine did not contend that his neglect of legal matters and mishandling of clients' funds was caused by alcohol or drug abuse. SeeLouisiana State Bar Ass'n v. Dumaine, supra. Even if we were to assume that Dumaine is chemically dependent, the record lacks sufficient evidence of his moral fitness to practice law to warrant a conclusion that alcoholism was the principal cause of his ethical violations. Furthermore, if we were to make the double or triple assumption that Dumaine suffers from a chemical dependency that was the primary cause of his violations, that he is otherwise morally fit to practice law, and that his impairment has been brought under control so that he can safely be allowed to practice, the evidence of record still does not satisfy us that the appropriate sanction is reinstatement upon the proposed conditions rather than supervised probation upon specified conditions for a stated term, with or without a period of suspension to be stayed during compliance with the conditions of probation. Consequently, we must have more information before we can determine the character of the lawyer and the impact of his possible chemical dependency upon it, in order to discover whether he is morally fit to continue in the practice of law and what conditions or supervision, if any, must be required before he is allowed to do so. See Louisiana State Bar Ass'n v.Hinrichs, supra, at 118. Evaluation by knowledgeable persons will be necessary to assist this court in making this determination and in formulating a probation plan if one is needed.
[16] This court has recognized that chemical dependency may cause an attorney to commit acts of professional misconduct which would not have occurred but for his impairment, and that in a case in which the misconduct stemmed primarily from the impairment, when the attorney has recognized his affliction and has attempted to overcome it, supervised probation may be the most effective means of assuring the lawyer's reform while affording protection to the public, the profession and the courts. Louisiana State Bar Ass'n v. Longenecker,538 So.2d 156, 163 (La. 1988) (per curiam). In that case, this court determined that the appropriate sanction for a chemically dependent lawyer's serious misconduct in handling clients' funds was probation for a period of two years subject to conditions to be imposed by the court and administered by its clerk of court. The factors that convinced this court Longenecker was morally fit to continue the practice of law subject to supervised probation were that, at the time of the infractions, he was suffering from an alcoholic psychosis that severely impaired his judgment; he had been a recovering alcoholic and had not taken a drink for over 3 1/2 years prior to imposition of the sanction; he had during this time actively participated in Alcoholics Anonymous programs and in counseling other impaired attorneys; he presented convincing evidence of other mitigating factors such as commitment to restitution, remorse, and cooperation in the proceedings; and he showed that his prior record was unblemished. Of crucial importance, however, was this court's conclusion from this evidence and the record as a whole that it was highly unlikely that the profession or the public would be endangered by the continuation of the attorney's license to practice law under probationary guidelines. Id. at 164.
[17] In its brief per curiam in Longenecker this court implicitly recognized most of the considerations that must underly a court's determination of whether to impose the sanction of probation, rather than disbarment or suspension, and the court's formulation of the conditions of probation. Other courts have articulated these considerations more fully in formal rules or within the context of judicial opinions.
[18] The Illinois Supreme Court, in a very significant disciplinary case involving alcoholism, In re Driscoll,85 Ill.2d 312, 53 Ill.Dec. 204, 423 N.E.2d 873 (1981), placed an attorney on probation after a brief suspension of six months, subject to special conditions, where the attorney had converted clients' funds while his judgment was *West Page 1202 
undermined by alcoholism, but thereafter had abstained from alcohol for two and one-half years and had led an exemplary life. The attorney was required to report to the Attorney Registration and Disciplinary Commission at specified intervals; to continue his program of rehabilitation, including active participation in Alcoholics Anonymous, the Lawyers' Assistance Program established by the Chicago Bar Association and the Illinois Bar Association, or some similar program acceptable to the Commission; and to comply with any other condition recommended by the Commission and approved by the court. The court high-lighted several considerations it considered to be important in determining whether to place an impaired attorney who had been adjudged guilty of serious misconduct on probation. If the misconduct accurately reflected his continuing character and proclivities, or if his alcoholism were only the occasion of his dishonesty and not a strong contributing cause, disbarment rather than probation would be appropriate. Id. 85 Ill.2d at 315, 53 Ill.Dec. at 205, 423 N.E.2d at 874. Where an attorney's behavior after his restoration to sanity confirmed that he was not an honest man, or where there was not detailed evidence to show the attorney's drinking was crucial to his misconduct, attorneys have been disbarred for misconduct even during insanity or alcoholism. Id. On the other hand, the court observed, Driscoll's judgment and will were undermined by alcoholism: "[I]t was not typical of respondent, who was sensible enough until he succumbed to drink, and who is sensible enough again now that he has recovered from his disability. * * * [T]he misconduct, like his other shortcomings, was dependent on his craving and will not be repeated once that craving is subdued." Id. The court was impressed by Driscoll's sincere, strenuous, and continuing successful effort to overcome his alcoholism, as well as his exemplary life before and after the incidents charged, and it recognized that the hardships created by a long suspension would not be conducive to sobriety, because respondent might actually be fitter after a short suspension than a long one. Id. 85 Ill.2d at 317, 53 Ill.Dec. at 206, 423 N.E.2d at 875.
[19] In 1983, subsequent to its decision in In re Driscoll, the Illinois Supreme Court adopted a rule governing probation generally in disciplinary cases. Illinois Supreme Court Rule 772 incorporates in broad form some of the key ideas of the court's Driscoll opinion. To be eligible for probation the attorney must demonstrate that he:
[20] (1) can perform legal services and the continued practice of law will not cause the courts or profession to fall into disrepute;
[21] (2) is unlikely to harm the public during the period of rehabilitation and the necessary conditions of probation can be adequately supervised;
[22] (3) has a disability which is temporary or minor and does not require treatment and transfer to inactive status; and
[23] (4) is not guilty of acts warranting disbarment. Ill. S.Ct. Rule 772.
[24] It is evident that the requirements set forth in the rule merely state the goals of probation in general using conclusory terms. The court must continue to rely on its more specific jurisprudential precepts to determine whether these goals would be promoted by permitting a fallen lawyer who is impaired by chemical dependency or mental illness to continue to practice as a probationer. Furthermore, in our opinion, the rule has been justly criticized as placing a questionable restriction on the availability of probation to impaired but recovering lawyers by providing that the attorney cannot have been guilty of acts warranting disbarment. See Carroll Feldman, Supreme Court Rule 772 — Support of the Impaired Lawyer, 73 Ill.B.J. 14, 17 (1984).
[25] The Supreme Court of Minnesota, in the framework of a judicial opinion, has also adopted criteria for determining when a lapsed attorney who pleads alcoholism should be considered eligible for probation. Under these guidelines, probation is appropriate when it is shown:
[26] 1. That the accused attorney is affected by alcoholism.
[27] 2. That the alcoholism caused the misconduct.
[28] 3. That the accused attorney is recovering from alcoholism and from any other *West Page 1203 
disorders which caused or contributed to the misconduct.
[29] 4. That the recovery has arrested the misconduct and the misconduct is not apt to reoccur.
[30] 5. That the accused attorney must establish these criteria by clear and convincing evidence.
[31] In re Johnson, 322 N.W.2d 616, 618 (Minn. 1982).
[32] The court went on to say that the critical issue was the second: it must be shown that the misconduct was caused by the alcoholism. Regarding the other factors, the court felt that both medical and nonmedical evidence could be important, but the court declined at that time to promulgate any specific evidentiary rules. Id. Other courts have given consideration to these or similar factors in deciding whether to impose probation as a sanction in cases involving alcoholic attorneys. See, e.g.,Tenner v. State Bar, 28 Cal.3d 202, 168 Cal.Rptr. 333,617 P.2d 486 (1980); In re Lewelling, 244 Or. 282,417 P.2d 1019 (1966); In re Walker, 254 N.W.2d 452 (S.D. 1977).
[33] Although we are not prepared to adopt a formal rule at this time, the Minnesota and Illinois rules (without the provision disqualifying lawyers guilty of offenses justifying disbarment), in combination with our expression in Longenecker, furnish helpful precepts for choosing those among impaired attorneys who should be allowed to practice on probation and may also be used as guidelines for shaping the conditions of their probation. The problem of chemical dependency among lawyers is so prevalent, however, that this court must soon adopt more systematic rules and procedures for evaluating disciplinary cases involving alcohol and drug abuse.
[34] In fact, there is now convincing evidence that chemical dependency is so widespread among the legal profession that it cannot be deterred or even coped with by the normal enforcement of the disciplinary rules. Instead, it is clear that the evil has become ascendant and, if it is to be curbed, must be addressed openly, vigorously and holistically by the entire organized bar.
[35] A growing body of studies indicates that attorneys are more at risk for various types of impairments, particularly alcohol abuse, than the general population. Spanhel, The Impact of Impaired Attorneys on the Texas Grievance Process, 52 Tex.B.J. 312 (1989); Benjamin, Are Lawyers Distressed . . . And How?!, Wash.St.Bar News, Feb. 1988, at 11; Benjamin, Psychological Distress in Law Students and New Lawyers, Wash.St.Bar News, Dec. 1985, at 13. Since it is widely accepted that about 10 per cent of the adult work force in the United States suffers from alcoholism, it may be conservatively assumed that more than 1,500 of the some 15,000 lawyers of the Louisiana State Bar Association are affected by the disease. Recent studies indicate, however, that among attorneys and some other professionals the rate of alcohol abuse may be more reliably estimated to be 20 to 30 per cent. See Sales, The Lawyers' Assistance Program: A Responsible and Effective Alternative for the Substance Impaired Lawyer, 52 Tex.B.J. 273 (1989). Accepting this appraisal as applicable to Louisiana lawyers, it indicates that some 3,000 to 4,500 of them are impaired by chemical dependency. When only attorneys involved in grievance proceedings are considered, the rate of impairment soars. Spanhel, supra, at 312. Experts estimate that between 40 and 60 per cent of lawyers who appear before disciplinary boards nationwide have some type of alcohol or drug abuse problem. Elliot, Lawyers Helping Lawyers, 25 Ga.St.B.J. 113 (1989); Blodgett, Cocaine Blues, 72 A.B.A.J. 25 (May 1, 1986).
[36] In response to the attorney impairment problem, 86 per cent of state bar associations now have some type of impaired lawyer assistance program. Spanhel, supra, at 312. In 1988 the American Bar Association Board of Governors approved the creation of an Impaired Attorneys Program, which will serve as an information clearinghouse and will provide a national network to strengthen and coordinate the activities of the various local programs. Id.
[37] In 1985 a committee first known as the "Impaired Professional Committee", but *West Page 1204 
later renamed the "Louisiana State Bar Association Committee on Alcohol and Drug Abuse", was created by Eldon E. Fallon, President of the Louisiana State Bar Association, to provide assistance to members of the bar who have become impaired by alcohol and drug abuse. In 1986, this court, upon the recommendation of the House of Delegates of the Louisiana State Bar Association, amended Article XV, Section 13 of the Articles of Incorporation of the Bar Association to recognize the Committee on Alcohol and Drug Abuse and to make privileged any attorney's communications with the Committee, its members or agents. La. Supreme Court Order of December 11, 1986. The Committee on Alcohol and Drug Abuse is therefore an absolutely confidential method of providing help to an impaired lawyer. By order of this Court, any information received by the Committee must remain completely confidential. Information the Committee receives from or about an impaired lawyer cannot be divulged to any other person, including any grievance or disciplinary committee, the Bar Association, or any committee or agent thereof.
[38] Lawyer assistance programs in several other states that have proven successful in combatting alcohol and drug abuse have employed full-time professional program directors, installed 800-hotlines and program offices separate from that of the state bar associations, and developed organized networks of practicing attorneys willing to provide assistance to impaired lawyers. That assistance usually consists of personal and individual assistance by attorneys recovering from the same type of impairment as the impaired lawyer. In some cases the programs address other forms of impairment including mental illness, emotional disorder, senility, physical impairment and poor work or management habits. See, e.g., Ruby, Someone Needs Help, 19 Md.B.J. 20 (Oct. 1986); Wolfson, Hope for Broken Lives and Careers — The Lawyers' Assistance Program, 73 Ill.B.J. 20 (1984).
[39] In response to the problem of attorney impairment in our state, this Court recommends that the Louisiana State Bar Association take the following steps (in which this court pledges its full support and cooperation): The Association should develop reliable data on the incidence of attorney impairment and the types of impairment most common in order to build more effective attorney assistance and disciplinary programs. As a first step in this process, the Association should direct and enable the Committee on Professional Responsibility and the Committee on Alcohol and Drug Abuse to make a study of the impact of attorney impairment on the disciplinary process. Based on this impact study, these committees should cooperate in devising programs for the evaluation, probation and supervision of lawyers who seek amelioration of discipline due to alleged chemical dependency or other impairment. When general data on the impaired lawyer problem has been developed, the bar association should provide the Committee on Alcohol and Drug Abuse the funding and other assistance necessary to address the problem effectively.
[40] In the interim, in the present case, and others involving allegedly impaired lawyers, the Committee on Professional Responsibility and the Committee on Alcohol and Drug Abuse are ordered to cooperate in furnishing this Court through properly introduced evidence data to assist this Court in evaluating Dumaine's alleged chemical dependency, propensity toward recovery, moral fitness to practice, as well as the relationship between any impairment he may have and his disciplinary violations. If it appears that the lawyer should be allowed to resume practice under probation, the committees are directed to devise a probation program, including the terms and conditions of probation and a method of supervision. The respondent attorney, who has the ultimate burden in proving justification for the amelioration of discipline for his ethical violations, may introduce his own evidence and probation proposal or join in the Committee presentations.
[41] With respect to probation, it is our opinion that we should not continue to require the clerk of this Court to supervise probationers, because it may eventually involve *West Page 1205 
him in adversarial proceedings with lawyers before this Court, and because the problem is too big for one person to handle. Instead, it would be more appropriate, and more in keeping with the concept of a self-governed bar, for the Committee on Professional Responsibility or a person or an entity designated by it to be the supervising agency. Some examples of supervisory arrangements are described in Florida Bar v. Neale, 432 So.2d 50
(Fla. 1983) (supervision of attorney with poor health by state bar); Florida Bar v. Neely, 417 So.2d 957 (Fla. 1982) (supervision of neglectful attorney by member of bar [as to quality of representation] and clerk of Supreme Court [caseload supervision]); Florida Bar v. Thorpe, 337 So.2d 392
(Fla. 1976) (supervision by clerk of Supreme Court); In reJohnson, 322 N.W.2d 616 (Minn. 1982) (supervision by attorney appointed by Lawyers Professional Responsibility Board);In re Maragos, 285 N.W.2d 541 (N.D. 1979) (supervision by attorney designated by respondent); In re Heath,296 Or. 683, 678 P.2d 736 (1984) (supervision by an attorney in respondent's state of residence to report to Oregon bar). Considering the unique nature of this disease, we also think that the supervising person or agency should be assisted by another attorney who is himself a recovering alcoholic. This attorney should be designated by the Committee on Professional Responsibility after consultation with the Committee on Alcohol and Drug Abuse and the respondent attorney. Of course, should a plan of supervised probation be necessary or desirable in this case, and the committees be unable to develop a supervision arrangement with sufficient speed to allow just and timely disposition, this court will entertain a request to direct the clerk of court to supervise the probation on an ad hoc basis.
[42] ORDER
[43] Accordingly, this case is remanded to the Committee on Professional Responsibility for an additional hearing at which both the attorney and the Committee will be afforded an opportunity to present additional evidence. The Committee is ordered to complete the hearing expeditiously, after affording itself and the attorney time to prepare adequately, and to file in this court the record thereof and a new petition for disciplinary action recommending a sanction, including a proposed plan of probation if appropriate. The attorney may join in the Committee's petition or file his own responsive pleading within the normal delay. Because the attorney has been convicted of a serious crime that, under the circumstances of that offense in combination with his disciplinary record calls into question his moral fitness, he will be suspended from the practice of law until further order of this court, and the burden will be on him to show whether and under what conditions he should be reinstated as an active practitioner.
[44] REMANDED TO COMMITTEE WITH INSTRUCTIONS.
[45] LEMMON, J., subscribes to the opinion, but notes that the costs of probation procedures and supervision should not be borne by the Bar Association, but by the respondent attorney who benefits from the probation by retaining his license to practice law.